[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-16090

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
AUG 23, 2010
JOHN LEY
CLERK

D. C. Docket No. 06-00084-CV-WLS

MARCUS R. JOHNSON,

Petitioner-Appellant,

versus

STEVEN UPTON,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Georgia

_____

**(August 23, 2010)**

Before CARNES, HULL and PRYOR, Circuit Judges.

HULL, Circuit Judge:

Marcus Ray Johnson, a Georgia prison inmate under a death sentence, appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. The issues on appeal concern whether Johnson's trial counsel were ineffective in the penalty phase as to evidence of Johnson's life history, escape from pretrial custody, and future dangerousness. After review and oral argument, we conclude the Georgia state court's denial of Johnson's ineffective counsel claims was not based on an unreasonable determination of the facts or an unreasonable application of clearly established federal law. Thus, we affirm.

## I. PRETRIAL BACKGROUND

### A. The Crime

On March 24, 1994, Johnson raped, murdered, and mutilated Angela Sizemore a few hours after meeting her at a bar in Albany, Georgia. See Johnson v. State, 519 S.E.2d 221, 225 (Ga. 1999). The Georgia Supreme Court set forth the evidence against Johnson:

> [T]he victim, Angela Sizemore, met Johnson in a west Albany bar called Fundamentals between 12:30 and 1:30 a.m. on March 24, 1994. Ms. Sizemore had been to a memorial service for an acquaintance the previous day, and she had been drinking so heavily the bar had stopped serving her. Johnson was wearing a black leather jacket, jeans, black biker boots, and a distinctive turquoise ring. According

2

to a witness, Johnson was angry and frustrated because another woman had spurned his advances earlier in the evening. The bar owner and its security officer (who both personally knew Johnson) testified that they saw Johnson and Ms. Sizemore kissing and behaving amorously. [At approximately 2:30 a.m.] Johnson and Ms. Sizemore left Fundamentals together; the bartender handed Ms. Sizemore's car keys directly to Johnson. They were seen walking towards Sixteenth Avenue.

At approximately 8:00 a.m. on March 24, 1994, a man walking his dog found Ms. Sizemore's white Suburban parked behind an apartment complex in east Albany, on the other side of town from Fundamentals. Ms. Sizemore's body was lying across the front passenger seat. . . .

Four people testified that they saw Johnson about an hour before the body was found. Two witnesses testified that [at around 7:00 a.m.] they saw him walk from the area where the victim's Suburban was parked through an apartment complex to a bus stop. He boarded a bus and asked if the bus would take him to the Monkey Palace (a bar where Johnson worked) in west Albany. Three witnesses, including the bus driver, identified Johnson as being on the bus (one of the witnesses who saw Johnson walk through the apartment complex boarded the same bus as he did). Two witnesses stated that their attention was drawn to Johnson because that area of Albany is predominantly African-American, and it was extremely unusual to see a Caucasian there at that time of day. All the witnesses testified that Johnson's clothes were soiled with dirt or a substance they had assumed to be red clay. The witnesses gave similar descriptions of his clothing; in court, two witnesses who sat near Johnson on the bus identified his jacket, boots and distinctive turquoise ring.

The police determined that Ms. Sizemore was murdered in a vacant lot near Sixteenth Avenue in west Albany. . . . The vacant lot is about two blocks from Fundamentals and about half a block from the house where Johnson lived with his mother.

A friend of Johnson testified that after he called her early on March 24, she picked him up at his house at 9:30 a.m. and took him to her home, where he slept on her couch for several hours. Johnson then told her he wanted to take a bus to Tennessee and that he needed

her to go to the Monkey Palace to pick up some money he was owed. At his request, she dropped him off near a church while she went to get the money. The police were waiting for Johnson to show up, and they returned with the friend and arrested Johnson. Before they told him why they were arresting him, he blurted, "I'm Marcus Ray Johnson. I'm the person you're looking for."

DNA testing revealed the presence of the victim's blood on Johnson's leather jacket. Johnson had a pocketknife that was consistent with the knife wounds on the victim's body. He had scratches on his hands, arms, and neck. In a statement, Johnson said he and the victim had sex in the vacant lot and he "kind of lost it." According to Johnson, the victim became angry because he did not want to "snuggle" after sex and he punched her in the face. He stated he "hit her hard" and then walked away, and he does not remember anything else until he woke up after daybreak in his front yard. He said, "I didn't kill her intentionally if I did kill her."

Id. at 225-26.

The condition of Sizemore's body evidenced Johnson's extreme brutality during her murder. Johnson sexually assaulted Sizemore with the limb of a pecan tree, which was shoved into her vagina until it tore through the back wall of her vagina and into her rectum. Sizemore was alive during the sexual assault.

Johnson also cut and stabbed Sizemore 41 times with a small, dull knife. Sizemore had grip marks (round or oval bruises caused when a person is grabbed tightly) on her upper extremities, knees, thighs, ankles, and the inside of her arms. She had severe bruising, abrasions, and other evidence of blunt trauma about her body, especially her face, head, arms, ankles, and feet. Sizemore was alive during this attack.

4

After mutilating and killing Sizemore, Johnson dragged her body from the attack area back to her car. Sizemore's body was discovered clothed, with her shirt pulled up and tied in a knot just below the breast area. Her pants were around her legs and her bra was tied in a knot around her right thigh and protruded from the pants. Dirt and sand drag marks were found on the side of her body and grass was found attached to her face. Johnson had dragged Sizemore's body from the attack area back to her car by using the knotted loops of her shirt and bra as handles.

## B.    Appointment of Counsel

The state trial court provided Johnson with two exceptionally well-qualified criminal defense attorneys. Four days after Johnson's arrest, the state trial court appointed experienced criminal trial attorney Ronnie Joe Lane.[1] Lane had practiced criminal law for almost 20 years and handled hundreds of criminal cases, including about 40 murder trials. In all four of his previous capital cases, Lane secured his clients life sentences. Lane tried two death penalty cases to life sentences and pled two other capital cases to life sentences.

On August 15, 1994, the State announced its intent to seek the death penalty. Johnson did not go to trial until almost four years later, in March 1998. In June 1997, at Lane's request, the state trial court appointed attorney Tony Jones to assist

[1]Lane currently serves as a Superior Court judge for the Pataula Judicial Circuit.

Lane.[2]  Jones had practiced criminal law for 14 years and had handled numerous felony cases, including at least two murder cases.  Lane and Jones served as co-counsel at trial.

## C.    Johnson's Transfer to Miller County Jail

Following his arrest, Johnson was housed in the overcrowded Dougherty County jail in Albany, Georgia.[3]  On June 5, 1994, Johnson was taken to a hospital for treatment after other inmates beat him.[4]  Lane knew that Johnson received other beatings from jail inmates.[5]  Lane saw Johnson had suffered injuries, but they were "mainly bruises and lacerations, . . . not anything that would have required him to be hospitalized."  Johnson gave Lane handwritten threatening notes that Johnson received in the Dougherty County jail.  Lane "knew it wasn't a healthy situation for [Johnson] to be there."

---

[2]Lane waited to request co-counsel until he determined he would not challenge venue because he wanted a local attorney as co-counsel.

[3]In January 1995, Dougherty County opened a second, newer jail.  We refer to that facility as the "new Dougherty County jail" and the first jail as either the "old Dougherty County jail" or simply the "Dougherty County jail."

[4]Records show Johnson was transported to the emergency room and diagnosed with contusions to his neck, arms, and face. X-rays revealed no fractures. Johnson complained of pain in his left wrist and left eye, suffered swelling in his left wrist, and had a knot on his forehead.

[5]Lane did not know of any alleged rapes.  Johnson in fact denied being raped or sexually assaulted.  In July 1995, Johnson underwent a psychological assessment at Central State Hospital, as part of which Johnson completed a questionnaire that included the question, "Have you ever been sexually or physically abused?  Explain."  Johnson wrote "No" next to "sexually," and next to "physically" he wrote, "physically abused in Dougherty Co. jail."

Attorney Lane met with Johnson at the jail on June 6, 1994, to discuss the jail conditions and his beating. Lane later met with the sheriffs of Dougherty County and nearby Miller County to discuss transferring Johnson to the Miller County jail. Lane told the Dougherty County sheriff about Johnson's abuse in the Dougherty County jail. Lane also preferred that Johnson be housed in the Miller County jail because it was closer to Lane's office in Donalsonville, Georgia.

After four months in the Dougherty County jail and because of Lane's request, Johnson was transferred to the Miller County jail in August 1994.

**D.    Johnson's Escape**

The Miller County jail was a small facility, and on the evening of October 2, 1994, the only deputy on duty was 76-year-old Brooks Sheffield. That evening, Johnson asked Deputy Sheffield if he could use the jail telephone. When Sheffield brought Johnson to the telephone, Johnson grabbed Sheffield's gun, struck Sheffield in the head with the butt of the gun, and escaped the jail. The next night, Johnson was found and taken back into custody.

Sheffield's head injury required 21 staples to close, plus follow-up care. X-rays showed no skull fracture or intracranial bleeding. There were no brain contusions. The CT scan "was deemed normal for a patient in Mr. Sheffield's age range." About seven months later, on April 27, 1995, Sheffield suffered a stroke.

7

He died in June 1995.

Upon Johnson's recapture, he was returned to the Miller County jail, where he remained until mid-November 1994. Johnson was then transferred back to a jail annex in Dougherty County, which was a separate, renovated building across the street from the old jail's cell blocks where Johnson was before. In January 1995, the new Dougherty County jail opened and Johnson was moved there. Johnson remained in the new Dougherty County jail until his trial ended.

According to Lane's billing records, on October 24, 1994 he met with Johnson at the Miller County jail and "discussed case, reviewed impact of escape and need for no further violations." This meeting, together with thirty miles' travel, took 3.2 hours. Lane later discussed the escape with an assistant district attorney. It is undisputed that Johnson never told Lane he escaped because he feared going back to the old Dougherty County jail.

## E.    Trial Counsel's Penalty-Phase Preparation

Lane first met with Johnson on the day Lane was appointed, March 28, 1994. Lane had good contact with Johnson and "visited him fairly regularly in jail." Johnson called Lane at Lane's home on average once a week throughout the four-year representation.

During the first approximately three years after his appointment, Lane chose

to focus his efforts on: (1) challenging Johnson's tape-recorded statement to police, which Johnson claimed, and Lane believed, was edited by police officers to erase Johnson's request for an attorney; (2) trying to suppress eyewitness identifications of Johnson and certain items of physical evidence; (3) "interact[ing] with various experts who were assisting [Lane] with these matters" and other experts who assisted Lane "on forensic matters related to Ms. Sizemore's death and the crime scenes"; and (4) "preparing and litigating numerous pre-trial motions."[6]

Johnson "maintained his innocence throughout" the case. Lane felt Johnson had a chance to be acquitted because of "the circumstantial nature of the evidence against Mr. Johnson and the lack of conclusive physical evidence tying him to a homicide." Lane testified:

> Compared to other death penalty cases where the evidence is just overwhelming that the person did it, this was not such a case. You would try that case totally differently. You'd forget about did he do it. And you start trying it about, well, why did he do it. This case was not like that.

As part of his pretrial preparation, Lane consulted with other criminal defense lawyers and with experienced capital attorneys at the Southern Center for Human Rights and the Multicounty Public Defender's Office, spoke with a

---

[6]After Jones was appointed, he and Lane worked together on the whole case, but Lane was lead counsel and did most of the work. Jones testified that "Lane was more in charge" of the penalty phase of the trial than Jones was.

9

mitigation specialist, and attended several death penalty seminars that stressed the importance of mitigation and the defendant's social history.

Lane began his penalty-phase investigation in earnest in 1997, about a year before trial, although he may have had discussions with Johnson in 1994 or 1995 about "what had happened to [Johnson] in his life." As detailed later, Lane discussed Johnson's background and marital, social, employment, and medical history not only with Johnson but also with his parents, brother, former girlfriend, and others. Two investigators were assigned to assist Lane.

Lane knew the State would use evidence of Johnson's escape in sentencing. Lane believed that "the escape incident could prove to be devastating to Mr. Johnson's case if [he] proceeded to a sentencing phase" because, in Lane's experience, "future dangerousness is of great concern to juries in capital cases, and an escape clearly raises the specter of future dangerous behavior in the jury's eyes." Lane felt the evidence of Johnson's escape "would be some of the most damaging evidence presented."

As noted earlier, Lane discussed the escape with Johnson for almost three hours. Although Johnson now alleges he escaped due to fear of going back to the old Dougherty County jail, Johnson never told Lane this. Lane acknowledged that he never asked Johnson specifically what made him escape. Nonetheless, it is

10

undisputed that Johnson never told Lane that he escaped because of his fear of going back to the old Dougherty County jail. In fact, even after the escape, Johnson was taken back to the Miller County jail.

## II. TRIAL: STATE'S WITNESSES AT PENALTY PHASE

From March 23 to April 7, 1998, Johnson was tried on charges of malice murder, felony murder, aggravated assault, aggravated battery, and rape. The jury found Johnson guilty of all charges.

At the penalty phase, the State called eleven witnesses. Lynwood Houston, a sheriff's deputy in Miller County, investigated Johnson's escape and testified about it. The jailer on duty, Sheffield, allowed Johnson to come into the control room to use the telephone. Once there, Johnson snatched the pistol out of Sheffield's holster and hit Sheffield in the head with it. Johnson fled the jail, taking Sheffield's pistol with him.

On cross-examination, Deputy Houston admitted that Johnson committed no crimes after his escape that Houston knew of, and that Johnson did not try to run or resist arrest when he was recaptured. Deputy Houston did not know how long Brooks Sheffield was in the hospital after Johnson hit him with the gun, but Sheffield did return to work for the county after the assault. Deputy Houston knew that after his injury, Sheffield did some work for the city too, and may have

11

directed the public works efforts around the courthouse square.

Dr. Peggy Rummel, the emergency room physician who treated Sheffield, testified that Sheffield "came to the emergency room with his head bleeding, and he stated at the time that he had been struck on his head with a gun butt during an assault by an escaping prisoner." Sheffield was 76 years old but was in good health except for his head injury. Dr. Rummel examined Sheffield, closed the wound, and sent Sheffield to get a CT scan "to make sure that no brain damage had resulted from the blow to his head." The injury came from a "pretty significant blow" that "caught the skin and had just literally scalped and peeled it down to where he had exposed bone and this was bleeding very heavily." It required 21 staples to close. Dr. Rummel opined that the injury resulted from a glancing blow and, with the amount of force that was used, a direct blow "would have crushed [Sheffield's] skull."

Dr. Rummel, who knew Sheffield personally, testified that after this incident, Sheffield "was just not the same man any more." Sheffield was "a very unhappy man afterwards" and "stayed home and stayed to himself." Seven months after Johnson's escape, Sheffield "suffered a stroke on that side and it was a bleed of one of the major arteries in that area and it had disastrous consequences for him." Sheffield died several weeks later. Dr. Rummel testified, though, that she

12

"[could ]not in all honesty tell you that there was a one hundred percent no doubt about it direct relationship" between the head injury and Sheffield's stroke seven months later.[7] On cross-examination, Dr. Rummel admitted that Sheffield drove himself to the hospital after receiving the head injury and that the CT scan taken after the assault revealed no internal bleeding in Sheffield's brain.

The State called Johnson's former probation officers, who testified Johnson received probation in September 1984 after pleading guilty to financial transaction card fraud, four counts of financial transaction card theft, and theft by receiving stolen property.[8] One officer testified that of the thousand persons he had supervised as a parole officer, Johnson's attitude was one of the ten worst. Johnson was "[v]ery resistant to supervision" and was rated a "maximum risk individual." Another officer confirmed Johnson had a negative attitude and failed to comply with the terms of his probation.

---

[7]Similarly, the State's penalty-phase closing argument suggested that the injury Johnson inflicted may have caused Sheffield's death, but admitted it may not have and maybe Sheffield would have died anyway:

> [Johnson] slugged a seventy-six year old deputy in the head, so severely that if it had been a direct blow it would have killed him. What did happen to him? Several months later, he suffered a stroke on the same side of his body that he got that hit; his health just kept going straight on down and he died and Mr. Lane or Mr. Jones may say, well, he didn't kill him, and maybe he didn't and maybe he would have died anyway, but that happened at the hands of this man, Marcus Ray Johnson, and there's no dispute of that, doing anything he could to get out of lawful confinement.

(Emphasis added.)

[8]The State admitted certified copies of Johnson's convictions, plea, and sentence.

The State closed its penalty-phase case with powerful victim impact testimony from five witnesses: Sizemore's then-eight-year-old daughter, mother, two sisters, and stepfather.  The State also showed the jury a video of the scene where Sizemore's body was found.

Sizemore's daughter described getting out of bed one morning when she was four years old and realizing her mother wasn't there and would never come back. She testified she still cried in school, and she wanted the man who killed her mother punished for taking her mother away from her.

Sizemore's mother and stepfather described Sizemore's kindness, generosity, adventurous spirit, and passion for being a mother.  Sizemore's mother testified that Sizemore's death "left a hole in our hearts that time won't heal."  She described her emotional struggle in raising her eight-year-old granddaughter while wondering if she will "learn to hate because of this" or "be distrusting or holding emotions of this trauma inside to the point that it destroys her ability to be a loving person."

Sizemore's sisters testified that Sizemore was their role model and best friend.  Sizemore was fearless and passionate and the most dedicated mother they knew.  Sizemore was full of life and did not want to die.  One sister testified about how heartbreaking it was to see the wistful look on Sizemore's daughter's face

14

when she looked at other families.  This sister wished it was she who had died instead of her sister because "it would have been easier than the daily hell I go through thinking about the last hours of my sister's life."

### III. TRIAL: DEFENSE'S WITNESSES AND CLOSING ARGUMENT AT PENALTY PHASE

The defense called four witnesses.  The defense's plan was primarily to argue residual doubt (also called lingering doubt).  Given there were no direct eyewitnesses to the murder, Lane believed lingering doubt would be paramount in the penalty phase.  He stated, "Lingering doubt was the whole thing in this case.  Without it, I didn't see any hope."

Reverend Bobby Moye was the pastor of Johnson's church and a friend of Johnson's family.  Rev. Moye testified that he had known Johnson since childhood and had baptized Johnson, and that Johnson was a "fine boy" who was "very kind" and "very involved in church."  On cross-examination, Rev. Moye stated that Johnson came to church as an adult, but Rev. Moye "could not accurately say how faithful he was or how dependable."

Reverend Jimmy O. Hall, Jr., Johnson's middle-school physical education teacher, testified that Johnson was "one of the students that stood out" and was "very dutiful" and "a very good student as far as participation."  Johnson was "a pretty good student," was "always cooperative," and did not cause trouble.

15

Johnson "would always worry . . . about could I take the equipment out and that kind of thing. May I lead exercise, things of that nature, may I be captain of the team, things of that nature." Rev. Hall sought out defense counsel and offered to testify on Johnson's behalf "[b]ecause I knew Ray Johnson . . . because I feel he's a good person." Rev. Hall admitted he did not know Johnson as an adult.

Brian Sherman, a friend of Johnson's, testified about his common interests with Johnson: (1) Johnson was a cabinetmaker and Sherman appreciated Johnson's artistry; and (2) Johnson and Sherman both enjoyed dancing. Sherman asked the jury not to sentence Johnson to death.

Johnson's mother, Rosemary Johnson, begged the jury "not [to] put [her] son to death." Rosemary Johnson testified that her son's arrest and trial had "destroyed [her] whole life . . . . I've had to carry the burden right by myself . . . and I have been right here with my child, and I will be with my child until my dying day. . . . Or to his dying day."

Lane spent most of his penalty-phase closing argument in an attempt to create lingering doubt. He told the jurors that although they decided Johnson was guilty, they "should not vote to kill Ray Johnson . . . because this is a circumstantial evidence death penalty murder case only." Lane argued the jurors "should have some doubt, some doubt, whatever, ever so slight, whatever doubt,

16

some doubt." Lane posed a number of hypothetical questions he argued that State had not satisfactorily answered, and asked the jurors whether they were sure enough in their verdict, "so sure, sure enough based on this circumstantial evidence, to vote to take a human being's life?" Lane emphasized that the death penalty is irreversible.

Afterward, Lane argued that the State "would have you believe that [Sheffield] died as a result of this wound that he got on his head" but "[t]hey have no proof of that." Lane pointed out that Sheffield had returned to work for the city and the county after the attack. Lane argued none of the State's other penalty-phase evidence was sufficient to justify a death sentence.

In Jones's portion of the closing argument, he discussed Johnson's life, emphasizing Johnson's helpfulness as a child and his church attendance. Jones also argued that Dr. Rummel would not have seen Sheffield much after he received his head injury because Sheffield was working at the hospital through his capacity as a Miller County deputy, and he was "no longer in that capacity with the county" after Johnson's escape. Johnson argued that the State's suggestion that Johnson killed Sheffield was "a most tragic play on the facts" and "unfair."

Jones also plied a residual-doubt argument, telling the jury that the State's case was circumstantial and that although the jury found Johnson guilty beyond a

reasonable doubt, "I'm begging you, before we execute this man, let us take that to a little higher level." Jones asked the jury to consider the "unanswered questions during the course of the trial."

## IV. SENTENCE AND DIRECT APPEAL

The jury returned a unanimous verdict fixing Johnson's sentence at death. The jury found beyond a reasonable doubt the existence of four statutory aggravating circumstances: (1) Johnson murdered Sizemore while he was engaged in the commission of another capital felony (i.e., rape); (2) Johnson murdered Sizemore while he was engaged in the commission of aggravated battery; (3) Johnson's murder of Sizemore was outrageously and wantonly vile, horrible, and inhumane in that it involved torture and depravity of mind; and (4) Johnson's murder of Sizemore was outrageously and wantonly vile, horrible, and inhumane in that it involved an aggravated battery. The state trial court sentenced Johnson to death on the malice murder conviction in accordance with the jury's recommendation. The state trial court sentenced Johnson to life imprisonment for the rape and to 20 years' imprisonment for the aggravated battery.[9]

---

[9]The aggravated assault conviction merged into the felony murder conviction, and the felony murder conviction was vacated by operation of law. See Johnson, 519 S.E.2d at 225 n.1 (citing Malcolm v. State, 434 S.E.2d 479, 482 (Ga. 1993) (noting that: (1) aggravated assault conviction, as underlying felony in felony murder count, merged into felony murder conviction as a matter of law; and (2) a defendant may be convicted in Georgia of both malice murder and felony murder of single victim, but may not be sentenced for both crimes)).

18

The Georgia Supreme Court affirmed Johnson's convictions and sentences. Johnson, 519 S.E.2d at 225. The United States Supreme Court denied Johnson's petition for certiorari. Johnson v. Georgia, 528 U.S. 1172, 120 S. Ct. 1199 (2000).

## V. STATE HABEAS PROCEEDINGS

After his direct appeal ended, Johnson obtained new counsel (who still represents Johnson) and filed a state habeas petition. Johnson's state petition claimed, among other things, that he received ineffective trial counsel because counsel did not adequately investigate and present: (1) evidence of the circumstances surrounding Johnson's escape from the Miller County jail; (2) the cause of Deputy Sheffield's death; (3) expert testimony and statistical evidence on Johnson's likelihood of future dangerousness; and (4) mitigating evidence from Johnson's life history.

The state habeas court held a three-day evidentiary hearing on June 24-26, 2002. Johnson's new counsel presented testimony from five witnesses, affidavits from thirty-four additional witnesses, and documentary exhibits. The State called six witnesses and also introduced documents.

The state habeas court issued a detailed 36-page order denying all of Johnson's claims. The state habeas court stated, "The court finds that the petitioner has failed to establish deficiency and resulting prejudice as to any of his

ineffective assistance of counsel claims." We discuss the relevant findings of the state habeas court in our later analysis of Johnson's claims in this appeal.

The Georgia Supreme Court denied Johnson's application for a certificate of probable cause to appeal the denial of his state habeas petition. The United States Supreme Court denied Johnson's certiorari petition. Johnson v. Terry, 547 U.S. 1059, 126 S. Ct. 1661, reh'g denied, 547 U.S. 1176, 126 S. Ct. 2349 (2006).

## VI. FEDERAL HABEAS PROCEEDINGS

On June 7, 2006, Johnson filed a 28 U.S.C. § 2254 petition in federal district court. On September 30, 2009, the district court denied Johnson's petition.

The district court granted Johnson a COA on three ineffective trial counsel claims as to the penalty phase: (1) whether "counsel was ineffective for failing to mitigate the circumstances around [Johnson's] escape from the Miller County Jail"; (2) whether "counsel was ineffective for failing to rebut or preclude testimony regarding the death of jailer Brooks Sheffield"; and (3) whether "counsel was ineffective in failing to rebut the state's future dangerous[ness] argument by using statistical and expert testimony." This Court expanded the COA to include a fourth claim: "[w]hether [Johnson's] trial counsel was ineffective in failing to investigate or present 'life history mitigation testimony' in the penalty phase."

## VII. STANDARD OF REVIEW

20

Section 2254, as amended by the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), "constrains our review of legal questions decided on the

merits in state court." Mason v. Allen, 605 F.3d 1114, 1119 (11th Cir. 2010).

> Under AEDPA, a federal court may not grant a habeas corpus application "with respect to any claim that was adjudicated on the merits in State court proceedings," 28 U.S.C. § 2254(d), unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).

Berghuis v. Thompkins, 560 U.S. —, 130 S. Ct. 2250, 2259 (2010). The Supreme

Court has described this standard as "a highly deferential" one that "demands that

state-court decisions be given the benefit of the doubt." Renico v. Lett, 559 U.S.

—, 130 S. Ct. 1855, 1862 (2010). However, where the petitioner makes the

required § 2254(d) showing as to a state court decision, we owe no AEDPA

deference to that decision and instead review the claim de novo. Jones v. Walker,

540 F.3d 1277, 1288 & n.5 (11th Cir. 2008) (en banc), cert. denied, 129 S. Ct.

1670 (2009); McGahee v. Ala. Dep't of Corr., 560 F.3d 1252, 1266 & n.20 (11th

Cir. 2009).

"We review de novo the district court's decision about whether the state

court acted contrary to clearly established federal law, unreasonably applied

federal law, or made an unreasonable determination of fact." Reed v. Sec'y, Fla.

21

Dep't of Corr., 593 F.3d 1217, 1239 (11th Cir. 2010), petition for cert. filed (U.S. Jun. 7, 2010) (No. 09-11314).  Because Johnson raised the ineffective trial counsel claims at issue here in his state habeas petition, and the Georgia Supreme Court denied Johnson's application for a certificate of probable cause to appeal the denial of that petition, the relevant state court merits decision in this case is the state habeas court's order.  See Thompkins, 130 S. Ct. at 2259 (stating, where state supreme court denied discretionary review, that "[t]he relevant state-court decision here is the Michigan Court of Appeals' decision . . . rejecting [Petitioner's] Miranda and ineffective-assistance-of-counsel claims on the merits").

## VIII.  ANALYSIS

All of Johnson's claims on appeal assert ineffective assistance of his trial counsel.  Ineffective counsel claims are governed by the two-pronged test enunciated in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984):

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  First, the defendant must show that counsel's performance was deficient. . . .  Second, the defendant must show that the deficient performance prejudiced the defense. . . . Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

Id. at 687, 104 S. Ct. at 2064.

For the performance prong, the governing standard is objectively reasonable

attorney conduct under prevailing professional norms:

> As to counsel's performance, "the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices." Bobby v. Van Hook, 558 U.S. –, 130 S. Ct. 13, 17, 175 L.Ed.2d 255 (2009) (quotation marks omitted). Thus, to establish deficient performance, a defendant must show that his counsel's conduct fell "'below an objective standard of reasonableness' in light of 'prevailing professional norms'" at the time the representation took place. Id. at 16 (quoting Strickland, 466 U.S. at 688, 104 S. Ct. at 2064-65). In assessing the reasonableness of counsel's performance, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065 (quotation marks omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690-91, 104 S. Ct. at 2066.

Reed, 593 F.3d at 1240.

For the prejudice prong, the test is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694, 104 S. Ct. at 2068. "To assess that probability, we consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweigh it against the evidence in aggravation." Porter v. McCollum, 558 U.S. —, 130 S. Ct. 447, 453-54 (2009) (quotation marks and brackets omitted); see Sears v.

23

Upton, — U.S. —, 130 S. Ct. 3259, 3267 (2010) ("A proper analysis of prejudice under Strickland would have taken into account the newly uncovered evidence . . . , along with the mitigation evidence introduced during Sears' penalty phase trial, to assess whether there is a reasonable probability that Sears would have received a different sentence after a constitutionally sufficient mitigation investigation.").

## A. Trial Counsel Performance: Evidence of Johnson's Escape

Johnson claims Lane unreasonably failed to investigate the circumstances of, and reasons for, Johnson's escape from the Miller County jail. Johnson contends a reasonable investigation would have revealed extenuating circumstances (Johnson feared a return to the Dougherty County jail, where he was repeatedly beaten and abused) that Lane should have presented to rebut the State's argument that the escape and attack on Sheffield showed Johnson would be a danger in prison.

The state habeas court concluded that counsel's performance was not deficient. The state habeas court expressly found that Johnson did not tell Lane about this now-alleged motivation to escape, so Lane had no reason to investigate further:

> The Petitioner contends that counsel failed to mitigate the damage that petitioner's escape prior to trial [caused] by putting forward the claim that petitioner was in some way justified in this escape because of his fear of the Dougherty County Jail. During the hearing, counsel for the

24

respondent asked Mr. Lane (now Judge Lane), "Did he ever tell you he escaped from the jail because he was afraid he was going to have to go back to the Dougherty County Jail?" The answer given was, "No, I never asked him."

. . . .

The court also finds that the evidence in this case shows that prior to trial, Petitioner never told trial counsel that he assaulted the guard and escaped because of his alleged fear of being returned to the "old" Dougherty County Jail. . . .

. . . .

An attorney does not render ineffective assistance by not discovering mitigating evidence that his client did not mention to him.

This decision is not contrary to, or based on an unreasonable application of, clearly established Supreme Court precedent. Nor is it based on an unreasonable determination of fact.

In Strickland, the Supreme Court explained that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions" because "[c]ounsel's actions are usually based, quite properly on . . . information supplied by the defendant." 466 U.S. at 691, 104 S. Ct. at 2066. Thus, "inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions." Id.; see Peterka v. McNeil, 532 F.3d 1199, 1208-09 (11th Cir. 2008) (concluding counsel's performance was not deficient for not learning of evidence that petitioner declined an opportunity to escape with his cellmates between penalty phase and trial court's sentencing because, even if counsel had duty to explore further mitigation at this

25

point, petitioner should have known this was evidence that counsel would be interested in as mitigation but petitioner did not tell counsel about it).

Here, it is undisputed that after Johnson's escape and recapture, Lane met with Johnson in person for approximately three hours, at which time Lane "reviewed [the] impact of [Johnson's] escape and [the] need for no further violations." It is also undisputed that Johnson did not – either at this three-hour meeting or at any other time during the four years before trial – tell Lane that he escaped from the Miller County jail because he feared being returned to the Dougherty County jail. Thus, Johnson did not tell Lane the now-purported reason for his escape despite having an extensive discussion about the impact that the escape would have at trial. Given the charges against him, Johnson was facing a potential death sentence and, at a minimum, life imprisonment. It is not objectively unreasonable for an attorney to assume that if there were some powerful reason for his client's escape from pretrial detention other than the usual reason for escapes (not wanting to be convicted and in jail), the client would have told him that reason when they discussed the impact the escape evidence would have at trial.

Nor did Lane have any reasonable basis for believing further investigation into the unrevealed reason for Johnson's escape would be likely to yield fruitful

26

information. Although Lane knew that Johnson had been beaten by other inmates at the Dougherty County jail, Johnson escaped from the Miller County jail, where he was treated well. And there was no actual transfer of Johnson in the offing that Lane would have or could have known about.[10] Moreover, after his escape Johnson was taken back to the Miller County jail.[11] Lane cannot be deficient for failing to investigate whether Johnson escaped because he was afraid of a non-existent jail transfer when "there is no indication that [Johnson] . . . gave [Lane] reason to believe that such evidence might exist." Lambrix v. Singletary, 72 F.3d 1500, 1505 (11th Cir. 1996).

Johnson argues the state habeas court's conclusion that Lane did not perform unreasonably is contrary to Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456 (2005), in which the Supreme Court concluded petitioner's trial counsel were deficient in failing to review the court file on his prior conviction that counsel

---

[10]Johnson himself did not testify in the state habeas proceeding. The most Johnson presented was the testimony of Ronnie Daniels (a/k/a "Sneaky D"), a former Miller County inmate, who testified that Johnson escaped after overhearing a conversation about another inmate being transferred to Dougherty County and mistakenly assuming the conversation was about him. Another fellow Miller County jail inmate, James Wright, testified that he spoke with Johnson after the escape and Johnson "told me that he was going to be transferred back to Dougherty County. He just kept saying, 'I can't go back there, I can't go back.'"

[11]Johnson states that one of Lane's investigators, George Waldrop, "somehow learned prior to trial" that Johnson escaped from the Miller County jail because he was under the mistaken belief that he was about to be transferred back to the Dougherty County jail. This is not correct. In his affidavit, Waldrop expressly states, "I didn't know anything about [Johnson's escape] until it was presented at sentencing."

27

knew the State intended to use at trial.  Id. at 383-84, 125 S. Ct. at 2464.  But Rompilla is materially different because it concerned trial counsel's failure to review a readily available public document that the State announced at least twice that it would rely upon at trial (i.e., the court file on the defendant's prior conviction, which included (1) psychological test results pointing to schizophrenia and other disorders, (2) test scores showing defendant's third-grade cognition level, and (3) a corrections officer's evaluation indicating defendant was reared in a slum, came early to the attention of juvenile authorities, quit school at 16, and abused alcohol).  Id. at 383-87, 390-91, 125 S. Ct. at 2464-68.  And Rompilla involves the failure of a lawyer to make any inquiry as to a specific, known, and available piece of evidence, not the failure to make a more open-ended inquiry about a prior event.  See id. at 389, 125 S. Ct. at 2467 ("Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there.")

Here, Lane spoke to Miller County officials, an assistant district attorney, and Johnson himself about the escape and attack.  Johnson's claim, though, is that Lane unreasonably failed to investigate and present evidence of Johnson's motivation for the escape and attack.  Johnson first alleged this personal motivation

28

in the state collateral proceedings.  His alleged motivation was not evidence in the possession of the State, nor was it in any public document.  It was something within Johnson's unique knowledge, and it was something an attorney could reasonably assume would be shared with him, if important, during an hours-long discussion of the impact of the escape.[12]  Consequently, the state habeas court's decision that Lane's investigation of Johnson's escape and failure to present evidence of the abuse Johnson received at the Dougherty County jail were not objectively unreasonable is not contrary to or an unreasonable application of the facts or clearly established federal law.

**B.    Trial Counsel Performance: Evidence of Sheffield's Death**

Johnson next claims his trial counsel performed deficiently by inadequately

---

[12]Johnson argues Lane's failure to affirmatively ask Johnson why he escaped was objectively unreasonable performance, citing Wiggins v. Smith, 539 U.S. 510, 531-34, 123 S. Ct. 2527, 2540-42 (2003), in which the Supreme Court concluded trial counsel's failure to investigate the petitioner's social background beyond a review of the presentence investigation report and social services records constituted deficient performance, despite the fact that the petitioner obviously knew his own background and did not volunteer it to counsel.  However, Wiggins expressly relied on the fact that "the evidence counsel uncovered in the social services records . . . would have led a reasonably competent attorney to investigate further."  Id. at 534, 123 S. Ct. at 2542.

Here, there was nothing in what Lane had learned about the escape or about Johnson's treatment at the Dougherty County jail that would have led any reasonably competent attorney to ask Johnson why he chose to escape from the Miller County jail.  To the contrary, Johnson, as would any defendant facing capital charges for a brutal killing and with a good chance of being convicted and sentenced to death, had an obvious reason for escaping: he did not want to be executed or spend the rest of his life in prison.  There was no basis for Lane or any other attorney in his position to suspect there might be some other reason.  The state habeas court's decision is not contrary to Wiggins.

29

rebutting the State's suggestion that Sheffield's head injury caused Sheffield's death eight months later. The state habeas court denied this claim.

The State sent Lane copies of Sheffield's medical records about his October 1994 head injury and Sheffield's June 1995 death certificate, which did not mention the head injury. Rather, the death certificate listed the cause of death as congestive heart failure and a stroke. Lane was in Miller County frequently after the escape, and he saw Sheffield at work supervising community service workers. Lane reviewed the medical records on Sheffield's head injury and used them to cross-examine the State's witnesses in the penalty phase.

In concluding there was no deficient performance, the state habeas court pointed out that Johnson's trial counsel showed: (1) Sheffield drove himself to the hospital; (2) Sheffield continued to work after the injury; and (3) Dr. Rummel admitted she could not say whether there was a causal connection between Sheffield's head injury and his death. Lane forced Dr. Rummel to admit that she ordered a CT scan for Sheffield, which "showed no bleeding" in Sheffield's brain. Dr. Rummel also admitted she was "[o]nly indirectly" aware of the CT scan results – i.e., she knew it showed no bleeding but presumably had not viewed the scan herself. And Lane elicited testimony from Deputy Houston that after the head injury Sheffield returned to work for the county and the city and may have directed

30

the public works efforts around the courthouse square.

Johnson contends Lane's performance was deficient because he did not (1) obtain the April 1995 medical records relating to Sheffield's stroke, and (2) retain a medical expert to testify there was no causal connection between the head injury and the stroke.

We conclude the state habeas court's decision that Lane's performance was not deficient did not involve an unreasonable determination of the facts or unreasonable application of clearly established federal law. First, there was no prior notice that Dr. Rummel would testify as she did. Lane said he was surprised. Second, Lane did take meaningful steps to rebut Dr. Rummel's suggestion that Johnson's attack on Sheffield contributed to his stroke, by eliciting testimony that Sheffield drove himself to the hospital and returned to work after the injury and that the CT scan taken after the injury revealed no bleeding. This was effective rebuttal, particularly given that the majority of Dr. Rummel's testimony concerned her opinion that Johnson's attack on Sheffield was brutal and his injury serious, not her opinion (which she, and the district attorney, admitted was not certain) that the injury may have caused Sheffield's stroke the next year.[13] Lane could not deny

---

[13]Dr. Rummel testified on direct examination (not cross-examination) that she could not be entirely sure that Johnson had caused Sheffield's death. So, from the start, the State's causation theory linking Sheffield's death with Johnson's attack was weak.

that Johnson caused Sheffield's head injury, and evidence of the attack and escape was highly aggravating. A reasonable attorney in Lane's position could have concluded that to focus too much time and attention on the long-term effect of Sheffield's injury would be counterproductive.[14]

Third, Sheffield's death certificate would not put a reasonably competent attorney on notice of a need to do more discovery or to obtain testimony from a medical expert. The medical records and CT scan on the head injury, which Lane had, showed a five- to six-inch laceration on Sheffield's head but no skull fracture or intracranial bleeding. The death certificate, which was signed by a doctor other than Dr. Rummel, indicated Sheffield died of "congestive heart failure" and a "hemorrhagic stroke – Right brain." There was no mention of the head injury, plus Sheffield was 77 years old (which the death certificate indicated). Moreover, the death certificate showed Sheffield died eight months after the head injury, which was a significant passage of time from the injury. In addition, Lane knew Sheffield had returned to work for the county and city during that time period. The mere inclusion of this document in the State's production was not enough to require any

---

[14]Johnson argues trial counsel should have had Dr. Brian Frist, a pathologist who testified for the defense in the guilt phase, opine that Sheffield's death was unrelated to the injury Johnson inflicted. However, Dr. Frist's testimony would not have come without cost. Dr. Frist would have brought Johnson's attack on Sheffield into the forefront and at a risk that the jury would view the "he wasn't hurt that badly" defense as callous. In any event, Johnson's trial counsel effectively cross-examined the State's only witness on this point – Dr. Rummel – and attacked the State's suggestion in their closing arguments.

reasonably competent attorney in Lane's position to divert time and resources from his effort to create lingering doubt to obtain expert testimony on the cause of Sheffield's 1995 stroke.

Under the circumstances, we conclude that the state habeas court did not unreasonably determine the facts or unreasonably apply clearly established federal law when it decided that Lane's penalty phase preparation and performance as to Sheffield's death was not objectively unreasonable under prevailing professional norms.

## C. Trial Counsel Performance: Life History Mitigation Evidence

Johnson claims his trial counsel were ineffective for failing to adequately investigate and present mitigating evidence from Johnson's life history. In the state habeas proceedings, Johnson proffered testimony from friends and family that he was capable of love, care, and support; showed particular respect and deference to the older adults in his family; and supported those with whom he lived. Johnson also would have had his attorneys focus on his abandonment by his father at age 15, even though he rejoined his father in California two years later. The state habeas court denied Johnson's claim, finding trial counsel's performance was reasonable:

> Petitioner also alleges that counsel were deficient and that he was prejudiced by counsel not presenting more mitigation evidence at trial.

33

Prior to trial, counsel talked extensively with Petitioner, spoke with Petitioner's family members on numerous occasions, and investigated Petitioner's childhood. Counsel obtained Petitioner's social history, criminal history and medical history. At the sentencing phase of trial, counsel introduced the testimony of Petitioner's mother, a friend of Petitioner's and two pastors to testify to Petitioner's good qualities and characteristics.

In addition to the heinous facts of the crime and the separate attack on Deputy Sheffield, the State introduced evidence that Petitioner had previously been convicted of theft by receiving and financial transaction card fraud for which he was put on probation; that, while on probation, Petitioner had to be told a number of times to quit acting out verbally when he reported to his probation officers; his probation officers testified that Petitioner had a horrible attitude about probation and that Petitioner was in the top ten of attitude problems among the thousands of probationers; Petitioner reported daily drug use while on probation and failed drug tests; Petitioner refused to keep probation appointments; Petitioner left the State against probation rules; Petitioner cursed detention officers while incarcerated; and Petitioner had verbal altercations with other inmates while incarcerated.

Further, in rebuttal to the additional evidence presented by Petitioner in this habeas proceeding if the same evidence had been submitted at Petitioner's trial, the State could have introduced evidence that Petitioner had a history of physically abusing women, including Melissa Windows and his ex-wife, Cindy Smith; that Ms. Smith stated Petitioner had a temper; that Petitioner had been in previous fights in bars; that Petitioner was noted by the Central State Hospital Staff as angry, loud and abusive; and that Petitioner was noted by the jail personnel to be sneaky and quick to anger when he did not get his way.

The court finds that the adequacy of a trial attorney's investigation into a defendant's background is judged by a standard of reasonableness. Counsel were not deficient because trial counsels' mitigation strategy was reasonable and supported by adequate investigation and because Petitioner cannot show actual prejudice. The failure of trial counsel to uncover every possible favorable witness does not render their performance deficient. The Court

recognizes that post-conviction counsel will almost always be able to identify a potential mitigation witness that trial counsel did not interview or a record that trial counsel did not obtain.

After reviewing the evidence, we conclude that the state habeas court's conclusion that trial counsel's performance in investigating and presenting mitigating evidence from Johnson's background was not deficient is not based on an unreasonable determination of the facts or unreasonable application of clearly established federal law.

First, the record is clear that trial counsel did investigate Johnson's background for mitigating evidence. Although during the first years of the case Lane focused his efforts on guilt-phase issues and pretrial motions, Lane began his mitigation investigation in early 1997, more than a year before trial. Lane talked with Johnson and several of his family members about Johnson's background.[15]

On February 15, 1997, Lane met with Johnson for several hours "to get some history about [Johnson]." The two discussed Johnson's school history. Johnson told Lane about his criminal history, and Lane found "nothing in it that was very serious." They also discussed Johnson's marital, social, employment, and medical history. Johnson told Lane, among other things, that he: (1) was held

---

[15]Additionally, second-chair counsel Jones met with Johnson for nearly five hours in December 1997 to discuss "mitigation information and family background information." Jones testified that "Lane was more in charge of [the mitigation] aspect of the case than I was."

back in third grade because of a reading problem and hyperactivity; (2) did not participate in sports or activities in Junior High; (3) quit school in tenth grade; (4) moved about six times from age 16 until the time of the murder; (5) received five years' probation for a theft by receiving conviction; (6) had two probation violations for failing a drug test and leaving the state; (7) was married to his ex-wife Cindy Smith for two years and lived with her for two years before that; (8) had used drugs, including marijuana, powder cocaine, methamphetamine, uppers, downers, heroin (once), and angel dust (once); (9) was arrested for possession of less than an ounce of marijuana but did not go to court on the charge; (10) received injuries (including head injuries) in bicycle, motorcycle, and car accidents as a child and adult; (11) was treated at three different hospitals; (12) was "15 when [his] parents separated"; and (13) worked at a Jiffy Lube and two restaurants. Three days later, Lane met with Johnson's mother and brother and learned of a time Johnson had defended a woman when a man tried to hurt her.

Lane got along well with Johnson's family and he spoke with them about possible mitigation issues. Lane testified specifically that he discussed Johnson's childhood with Johnson's mother and father.[16] Lane also talked a lot with Connie Givens, who was a friend and former girlfriend of Johnson's. For example, on

_____

[16]Lane called Johnson's mother to testify at the penalty phase, but his father called Lane before trial and told him he would be unable to attend.

36

November 22, 1994, Lane spent several hours meeting with Givens to discuss

Johnson's "mental history." In sum, Johnson's attorneys clearly investigated

Johnson's background for mitigation evidence.[17]

Second, Lane decided to employ a residual doubt strategy for the penalty

phase. Lane felt Johnson had a chance to be acquitted because of "the

circumstantial nature of the evidence against Mr. Johnson and the lack of

conclusive physical evidence tying him to a homicide." Lane testified:

> Compared to other death penalty cases where the evidence is just
> overwhelming that the person did it, this was not such a case. You
> would try that case totally differently. You'd forget about did he do
> it. And you start trying it about, well, why did he do it. This case was
> not like that.

Lane believed that if Johnson were convicted, residual doubt would be the only

way to win a life sentence. He testified, "Lingering doubt was the whole thing in

this case. Without it, I didn't see any hope."

---

[17]In his affidavit, Lane stated that he "neglected to prepare adequately for the sentencing phase when [he] had the time, and in the end [he] had too little time to develop a coherent and convincing presentation at sentencing." Of course, the test for deficient performance is an objective one, so Lane's subjective belief that his performance was deficient is far from determinative. See Windom v. Sec'y, Dep't of Corr., 578 F.3d 1227, 1246 n.11 (11th Cir. 2009) ("Because the adequacy of an attorney's performance is measured against an objective standard of reasonableness, the fact that trial counsel admits that his performance was lacking is of little, if any, consequence."), cert. denied, 130 S. Ct. 2367 (2010); Jennings v. McDonough, 490 F.3d 1230, 1247 (11th Cir. 2007) ("The Strickland standard of objective reasonableness does not depend on the subjective intentions of the attorney, judgments made in hindsight, or an attorney's admission of deficient performance."). And the objective evidence shows that Lane engaged in a constitutionally adequate investigation of Johnson's background, though perhaps not one that was as comprehensive as in hindsight he now would prefer.

Lane's belief in the paramount importance of lingering doubt, and his consequent decision to focus on guilt-phase (and doubt-creating) issues for most of the pretrial period, was not objectively unreasonable. As the state habeas court noted, "the state had no eyewitness to the crime itself and was forced to present a circumstantial evidence case" and Lane's chance to provide sufficient mitigating evidence at the penalty phase "was made incredibly more difficult" by Johnson's escape from the Miller County jail and attack on Sheffield.

Johnson argues that the scope of trial counsel's investigation into mitigating evidence from Johnson's life history was objectively unreasonable. However, as the Supreme Court stated in Van Hook while rejecting a similar argument:

> This is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, cf. Wiggins, 539 U.S., at 525, 123 S. Ct. 2527, or would have been apparent from documents any reasonable attorney would have obtained, cf. Rompilla v. Beard, 545 U.S. 374, 389-393, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005). It is instead a case, like Strickland itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."

Van Hook, 130 S. Ct. at 19. Here, trial counsel investigated Johnson's background, in particular his social, education, criminal, and medical history, but found no "potentially powerful mitigating evidence." Under the circumstances, reasonable attorneys could have chosen, as trial counsel did here, to focus most of

their time and effort on investigations supporting residual doubt.

As to presentation, trial counsel called four witnesses in the penalty phase: a minister and teacher who each spoke about Johnson's good character; a friend of Johnson's who testified about Johnson's love of cabinetmaking and dance; and Johnson's mother, who pled for mercy on her son's behalf. This testimony served to humanize Johnson to the jury.

Moreover, had Johnson's trial counsel emphasized Johnson's good character, as Johnson now contends they should have, the State would have had greater incentive to introduce rebuttal evidence (which it did not introduce at trial) that not only would have undercut the good-character evidence, but also would have dealt a powerful blow to the defense's core penalty-phase strategy of creating lingering doubt. In particular, the State could have introduced evidence that Johnson had a temper and physically abused his ex-wife Cynthia Smith, his ex-girlfriend Melissa Windows, and, on one occasion, one of Smith's daughters. Given this potential rebuttal evidence, and the aggravating evidence of (1) the circumstances of Sizemore's murder, rape, and mutilation, and (2) Johnson's escape and attack on Sheffield, it was reasonable for counsel to present evidence of Johnson's childhood, hobbies, and a mercy plea from Johnson's mother in lieu of a full-bore good-character strategy. The new mitigation evidence would have risked

the State presenting specific rebuttal evidence that would have damaged Johnson's character. See Wood v. Allen, 542 F.3d 1281, 1313 (11th Cir. 2008) ("[W]e have rejected prejudice arguments where mitigation evidence . . . would have opened the door to damaging evidence."), aff'd, — U.S. —, 130 S. Ct. 841 (2010).[18]

## D.     Trial Counsel Performance:  Expert Future-Dangerousness Testimony

Johnson also claims trial counsel were deficient in the penalty phase by not presenting expert testimony and statistics on the issue of Johnson's future dangerousness.  In the state habeas proceedings, Johnson introduced expert and statistical evidence about prison trends and future dangerousness of lifers in prison. For example, forensic psychologist Dr. Thomas Reidy testified about studies showing that (1) the offense of conviction, prior convictions, and escape history are only weakly correlated with prison violence, (2) prisoners are less likely to misbehave as they age, and (3) prisoners with long-term sentences are more likely to successfully adjust to prison.  Dr. Reidy opined that Georgia would classify

---

[18]Johnson argues that his trial counsel already introduced evidence of his good character at the penalty phase (just not enough), and the State did not introduce this rebuttal evidence, so it is not appropriate to assume the State would do so in the face of the proffered evidence.  This ignores the fact that when, in the state habeas case, Johnson proffered such evidence, the State introduced the rebuttal evidence of, inter alia, Johnson's domestic abuse and violent temper. Thus, it is reasonable to conclude the odds were good that had Johnson's counsel introduced the proffered mitigation evidence at trial, the State would have introduced its proffered rebuttal evidence.  The point is that if Johnson's counsel had focused their penalty-phase presentation on life history mitigation evidence (as opposed to lingering doubt) and called a lot more witnesses as to Johnson's good character as an adult, the State would have done more on this score too – as happened in the state habeas hearing.

40

Johnson as a "maximum security" or "hi-max" prisoner and has safeguards to minimize the risk posed by such potentially dangerous prisoners, and thus Johnson was less likely to be violent in prison.

Former corrections commissioner and warden James Aiken testified that Georgia prisoners are effectively inhibited from committing violent infractions by the structure and security measures of the prison environment. Aiken testified that Johnson would receive a "maximum" or "hi-max" security classification, "meaning that he would be subjected to the most stringent security measures available, including highly restrictive confinement and close supervision." If Johnson were "deemed a problem inmate inclined toward misconduct, adequate measures would be taken to segregate him from the general prison population and restrict his movement, thereby negating the opportunity and ability to commit misconduct." Aiken and Dr. Reidy listed some of the high-level security and prophylactic measures employed in state prisons: housing in high-security facilities equipped with electronic perimeter detection systems, closed circuit television cameras, and listening devices; single cell placement; and administrative segregation.

Sociologist Dr. Michael Radelet testified that most prisoners convicted of capital murder but sentenced to long-term imprisonment adjust satisfactorily to prison. Dr. Radelet agreed with Dr. Reidy's and Aiken's conclusions and opined

41

that Johnson's probability for a satisfactory adjustment to prison would be greater than most because he was older than most offenders and had no prior convictions for violent crimes.

Dr. Tim Carr, a Georgia corrections department statistician, compiled statistics regarding infraction rates between long-term inmates and the general inmate population. Dr. Carr testified that long-term inmates generally have lower rates of infractions because they are housed in more secure conditions. But Dr. Carr testified that the statistics showed only minor variations and were not conclusive, as follows:

> Q     Putting what you said about very little difference between the numbers aside, or in your opinion, could I go through and basically pick and choose things to support whatever position I wanted?
> A     Yes.  If you wanted to say, for instance, that the general population inmates were better than, for example, lifers, you could pick out many examples from the reams of statistics that I produced, or you could make exactly the opposite case and pull out numerous examples in the opposite direction.
> . . . .
> [I]f you were to go carefully through those printouts and put a poker chip over here in this pile every time you found where lifers were better than average inmates, put it in this pile, when you find the opposite, you put it in this pile, by the time you had finished you would have, roughly, equal piles of poker chips.
> Q     Okay.  So again, I can make these numbers say just about anything I want them to?
> A     That's correct.[19]

---

[19]We reject Johnson's claim that the state habeas court's conclusion that the statistics were easily manipulable was an unreasonable determination of the facts.

As to the expert future dangerousness testimony, the state habeas court noted that: (1) "Petitioner's habeas experts testified that the prison system would find that Petitioner was a high risk and dangerous and therefore place him in maximum security which would 'control' his dangerousness"; (2) "[e]xperts conceded that Petitioner would be classified as 'maximum' or 'hi-max' security level because of his crime and past escape"; and (3) "[t]he statistician for the Georgia Department of Corrections who compiled the statistics used by Petitioner's experts in this case testified that the data, over all, showed minor variances, was easily manipulated and could be used to support almost any conclusion."

Before Johnson's trial, Lane actually had used Dr. Radelet as a witness on future dangerousness in another capital case. Thus, Lane knew about the availability of experts who would testify that a convicted murderer serving a long sentence will be classified as maximum security and thus will be in a highly restricted confinement under close supervision, will age and adjust to prison life, and will not present a danger in prison. Even though Lane contacted Dr. Radelet about Johnson's case and got funds to hire him, Lane never called Dr. Radelet as a witness. The state habeas court found that Lane made a strategic decision not to call Dr. Radelet in Johnson's case, but that fact finding is not supported by the record. Although Lane obtained the funds to pay for Dr. Radelet's 15 hours'

preparation time approximately three weeks before he was to testify, Lane testified Dr. Radelet had a busy teaching schedule and was too busy to get ready in that time period. Thus, we examine Johnson's future-dangerousness claim de novo on the basis of whether a reasonably competent trial counsel is deficient for not presenting this type of future dangerousness testimony that counsel knew experts would give.

The State makes several strong arguments about how a trial counsel's not presenting this expert future dangerousness testimony "falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. First, the experts' opinions that Johnson would be unlikely to harm guards or fellow inmates in prison were based in large part on the fact that prison authorities would classify him as a maximum security inmate based on his murder conviction and escape history. Their opinions did not focus on a mitigating lack of propensity to violence in Johnson's character, but rather on the fact that the structured, maximum security prison setting likely would control Johnson and not permit him to act on any desires to escape or commit acts of violence. They also serve to emphasize the point, not favorable to Johnson, that the prison system would classify him as a high security inmate because it would consider him to present a high risk of misconduct or escape.

Second, the statistics upon which Johnson's experts rely could be read either way. In other words, as statistician Dr. Carr testified, the statistics showed only minor variances between the prison misconduct rates of life-sentenced prisoners and the general population, were not conclusive, and could be used to support either position. Additionally, Carr's statistics were of a general nature that would have had little, if any, mitigating effect.

Third, a reasonable attorney could simply conclude that the experts' core opinion – that statistical data about other inmates proved Johnson presented a low risk of future harm in spite of his having recently attacked a jailer and escaped – was weak and would not persuade Johnson's jurors.

For the reasons argued by the State, we conclude that a reasonable attorney could decide that under the particular facts of this case the future dangerousness testimony would not be helpful.[20] Thus, Johnson has not shown deficient

---

[20]We note that this is not a case in which the State introduced expert testimony about the defendant's future dangerousness and the defendant was denied an opportunity to directly rebut that testimony with his own expert. See Clisby v. Jones, 960 F.2d 925, 929 n.7 (11th Cir. 1992). Nor is this a case like Williams v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), cited by Johnson, in which the State's two experts testified there was a "high probability" that Williams posed a serious continuing security threat and defendant's attorneys failed to elicit: (1) evidence of Williams's "nightmarish childhood," including criminal neglect by his parents, severe abuse by his father, and his time in an abusive foster home; (2) that correctional officers were willing to testify Williams would not pose a danger while incarcerated; (3) that Williams received prison commendations for breaking up a drug ring and returning an officer's wallet; and (4) an admission from the State's testifying future dangerousness experts that the defendant would not pose a threat in the future if kept in a structured environment. Id. at 368-71, 373 & n.4, 395-98, 120 S. Ct. at 1500-02 & n.4, 1514-15.

performance as to this claim.

## E.    Prejudice

The state habeas court found that Johnson did not satisfy the prejudice prong as to any ineffective trial counsel claims. The state habeas court found the expert testimony about future dangerousness would have been unpersuasive to any juror given Johnson had stabbed Sizemore 41 times, had sexually assaulted her with a tree limb, and had escaped from jail and assaulted a 76-year-old guard with a gun, stating:

> In light of the evidence that Petitioner had stabbed Angela Sizemore 41 times, vaginally assaulted her with a tree limb while she was still alive, subsequently escaped from the Miller County Jail by taking a 76 year-old guard's gun and assaulting the guard with the gun causing an injury requiring 21 staples, this additional evidence to attempt to show Petitioner would not be dangerous in the future in a prison setting through expert opinion testimony would have been unpersuasive to the jury and would not with reasonable probability have changed the outcome of Petitioner's case in the face of such irrefutable evidence of the defendant's apparent ability to justify himself in an aggravated assault on an elderly detention officer in order to illegally gain his own freedom for whatever reason.

The state habeas court also stressed that Johnson's trial attorneys had no evidence to refute Johnson's actual commission of the aggravated assault on the jail guard, finding:

> The Petitioner submits no argument that there was any evidence that his trial attorneys had available to refute the actual commission of the aggravated assault and escape. The court does not find that the

evidence as to the extent of the injury to the jailer and the testimony of the pathologists contradicting the treating physician would . . . have deterred a juror who had already found the defendant guilty of raping, torturing and murdering Ms. Sizemore from imposing the death penalty on petitioner, and the court does not find counsel ineffective in not offering such unpersuasive evidence.

The state habeas court noted that if Johnson's additional evidence was presented, the State would have presented additional aggravating evidence, such as how Johnson had physically attacked his ex-girlfriend and ex-wife, had been in fights in bars, and was described by jail officials as sneaky and quick to anger when he did not get his way.

Considering "collectively" all of the evidence at the state habeas hearing, the state habeas court found no prejudice:

The court further finds that even if the additional evidence submitted by Petitioner in mitigation had been presented at trial, Petitioner must establish prejudice. This court is unable to conclude under the relevant burden of proof that the evidence presented at the state habeas corpus hearing, considered collectively, in light of the additional, potential aggravating evidence available to the State would with reasonable probability have changed the outcome of Petitioner's trial.

(Emphasis omitted.)

We conclude that the state habeas court's decision as to the prejudice prong of Johnson's ineffective trial counsel claims is not contrary to, nor based on an

unreasonable application of, clearly established federal law.[21]

Most if not all of the mitigation evidence Johnson proffers is weak when compared to the evidence in aggravation. The jury found Johnson guilty of the brutal, torturous murder of Angela Sizemore. The nature of the crime is powerful evidence in aggravation – Johnson stabbed Sizemore 41 times and sexually assaulted her with a pecan tree limb, all while she was still alive, and then dragged and dumped her body. The victim impact evidence is powerful too, because Johnson's killing of Sizemore left a four-year-old girl motherless and devastated Sizemore's entire family. Sizemore's sister testified her own death would be easier than living with daily thoughts of what Sizemore's last moments were like. Further, the evidence was undisputed that while awaiting trial for Sizemore's murder, Johnson attacked a 76-year-old jailer to escape from jail, an attack that required 21 staples to close the jailer's head wound. The state habeas court reasonably concluded that Johnson's own conduct made his trial counsel's task at the penalty phase "incredibly more difficult."

Moreover, much of Johnson's mitigating evidence would be contradicted or undercut by other evidence. For example, hospital treatment records show that

---

[21]We also reject Johnson's arguments that the state habeas court applied the wrong legal standard or based its decision on an unreasonable determination of the facts.

48

Johnson denied being the victim of a sexual assault at the Dougherty County jail.[22]

While Johnson claimed he was physically abused, the only documented instance is a June 1994 attack for which Johnson was taken to the emergency room and diagnosed with swelling in his left wrist, a knot on his forehead, and bruises to his neck, arms, and face. Although Johnson claimed he escaped for fear of returning to the Dougherty County jail, Johnson was in the Miller County jail at the time of his escape and there were no plans at the time to transfer him back to Dougherty County. Indeed, even after his escape, Johnson was returned to the Miller County jail and he never told attorney Lane of this alleged fear.[23] More fundamentally, even if the jury accepted Johnson's alleged reason for his escape and that his attack on Sheffield was unrelated to the stroke, the undisputed evidence still reveals Johnson as a man willing to savagely beat a 76-year-old jailer to save himself.

Johnson's other categories of proposed mitigation suffer from similar flaws. Although Johnson's future dangerousness experts opined that they believed

---

[22]In July 1995, Johnson underwent a psychological assessment at Central State Hospital, as part of which Johnson completed a "comprehensive assessment" questionnaire. One of the questions was, "Have you ever been sexually or physically abused? Explain." Johnson wrote "No" next to "sexually," and next to "physically" he wrote, "physically abused in Dougherty Co. jail."

[23]The jury easily could have rejected the notion that Johnson had a reasonable belief that he was going to be transferred, especially since after the escape he went back to the Miller County jail and ultimately went to the new Dougherty County jail facility when it opened in January 1995. Alternatively, the jury could have concluded that if Johnson feared a transfer, he simply could have asked Lane to make sure he stayed in the Miller County jail.

Johnson would likely adjust well to a prison setting and would not likely harm other people in prison, their testimony was based in part on the fact that Johnson would be classified by the prison system as a maximum security prisoner because of his murder offense and escape history.[24]  In other words, Johnson would be unlikely to harm others not necessarily because he is unwilling to do so but because he would be watched and confined enough that he would be unlikely to be able to.  Such testimony is obviously less mitigating than testimony that a defendant would not be dangerous because of his character or other intrinsic factors.  Moreover, as the state habeas court noted, Johnson's experts' opinions were based on an analysis of prison statistics that, according to the statistician who compiled them, showed only very small differences and could be used to support almost any position.

Similarly, Johnson's proffered life history mitigation is utterly devoid of the power or emotional heft of the evidence present in cases where the Supreme Court has determined that the prejudice prong was satisfied.  Johnson was not sexually or physically abused or deprived of food by his parents, and they did not separate

---

[24]Although Johnson's experts believed the prison system's classification would "overcompensate" for Johnson's actual risk profile, that belief rested on, inter alia, the experts' discounting of Johnson's escape history as a "unique" event permitted by Sheffield's negligent behavior and motivated by Johnson's "reason[able]" fear of being transferred back to the Dougherty County jail.  Jurors may have chosen not to discount, as Johnson's experts did, Johnson's actual history of violent escape.

until Johnson was fifteen.  Compare Porter v. McCollum, — U.S. —, 130 S. Ct. 447, 454 (2009) (finding evidence of Porter's heroic military service and resulting emotional scars, brain abnormality, and childhood physical abuse was the "kind of troubled history we have declared relevant to assessing a defendant's moral culpability"); Rompilla, 545 U.S. at 390-93, 125 S. Ct. at 2468-69 (finding prejudice prong satisfied by evidence that Rompilla's parents were alcoholics, his father frequently beat his mother and bragged about his infidelity, his father beat Rompilla and locked him and his brother in an excrement-filled dog pen, Rompilla slept in an unheated attic, and he was given no clothes and went to school in rags); Wiggins, 539 U.S. at 534-35, 123 S. Ct. at 2542 (noting evidence, inter alia, of "severe privation and abuse in the first six years of . . . life," and "physical torment, sexual molestation, and repeated rape during . . . subsequent years in foster care"); Williams, 529 U.S. at 395-98, 120 S. Ct. at 1514-15 (finding counsel prejudiced Williams by not presenting graphic evidence of defendant's "nightmarish childhood" that included his parents' imprisonment for criminal neglect of him and his siblings, his severe and frequent beatings by his father, and his commitment to an abusive foster home).  Nor would it enable the jury to "understand [Johnson] and his horrendous acts."  Sears v. Upton, 561 U.S. —, 130 S. Ct. 3259, 3264 (2010).

51

Instead, Johnson's proffered life history mitigation of Johnson's good character as an adult stood in stark contrast to the brutal nature of Sizemore's murder and Johnson's admitted aggravated assault on Deputy Sheffield, and may well have prompted the State to introduce evidence of Johnson's violent temper and physical abuse of his ex-wife Cynthia Smith and his ex-girlfriend Melissa Windows, which not only would have undercut Johnson's good-character mitigation but also would have devastated his residual doubt theory. If the additional life history evidence was admitted, the State would have had more incentive to introduce the rebuttal evidence listed by the state habeas court: (1) "that Petitioner had a history of physically abusing women, including Melissa Windows and his ex-wife, Cindy Smith"; (2) "that Ms. Smith stated Petitioner had a temper"; (3) "that Petitioner had been in previous fights in bars"; (4) "that Petitioner was noted by the Central State Hospital Staff as angry, loud and abusive"; and (5) "that Petitioner was noted by the jail personnel to be sneaky and quick to anger when he did not get his way."

On prejudice grounds, this case is closer to Wong v. Belmontes, 558 U.S. —, 130 S. Ct. 383, 387-90 (2009), in which the Supreme Court found no prejudice from counsel's failure to present (1) cumulative evidence of Belmontes's difficult childhood and good character, (2) expert opinion that he was likely to have a

52

nonviolent adjustment to a prison setting that would have opened the door to evidence Belmontes had committed another murder, and (3) evidence of Belmontes's emotional instability and impaired planning and reasoning ability that was undercut by the calculated nature of the murder and Belmontes's subsequent bragging about it.

In sum, Johnson's state habeas evidence and the mitigation testimony at the penalty phase, considered collectively, are not nearly strong enough when weighed against the extreme evidence in aggravation for us to conclude that Johnson has shown prejudice. Contrary to Johnson's assertions, this is a case in which "the new evidence would barely have altered the sentencing profile presented" to Johnson's jury. Porter, 130 S. Ct. at 454 (quotation marks omitted). It was thus not unreasonable for the state habeas court to conclude that Johnson had failed to show a reasonable probability that he would receive a different sentence. Accordingly, the state habeas court did not unreasonably determine the facts or unreasonably apply established Supreme Court precedent when it concluded Johnson did not satisfy the prejudice prong as to his ineffective trial counsel claims.

## IX. CONCLUSION

We affirm the district court's denial of Johnson's § 2254 petition.

**AFFIRMED.**

53