[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 08-13773

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 23, 2011
JOHN LEY
CLERK

D. C. Docket No. 04-00140-CV-T-23-MAP

MARVIN C. GILL,

Petitioner-Appellant,

versus

P.J. MECUSKER,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 23, 2011)

Before TJOFLAT, HILL, and ALARCÓN,* Circuit Judges.

ALARCÓN, Circuit Judge:

_____

*Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting
by designation.

Marvin C. Gill appeals from the district court's denial of his petition for habeas corpus, pursuant to 28 U.S.C. § 2254. We issued a Certificate of Appealability on the following issue: whether the district court erred in finding that appellant did not "clearly and unequivocally" assert his desire to represent himself, where the state trial court found that appellant attempted to waive his right to counsel but the waiver was not knowing and voluntary. After oral argument and careful review of the record and the briefs filed herein, we conclude that the district court's denial of Gill's petition is due to be affirmed.

**I**

**A**

Gill was originally charged with eight counts of capital sexual battery of a child under the age of twelve. Four counts involved a seven-year-old girl, and four counts involved an eight-year-old girl. The incidents occurred on May 2, 1987, while the two girls were staying at Gill's home. After two counts were dismissed, Gill originally was tried for six counts of capital sexual battery. The jury at Gill's original trial found him guilty of one count and guilty of the lesser included offense of lewd and lascivious act charged on another count as to one of the girls. As to the other girl, the jury found Gill guilty of the lesser included offense of lewd and lascivious act charged in count five and guilty of the lesser

2

included offense of attempted sexual battery charged in count six. Gill received consecutive sentences of fifteen years for each of the two lewd and lascivious acts, thirty years for the attempted sexual battery, and life with a minimum of twenty-five years for the capital sexual battery.

Following his first trial and conviction, Gill filed a motion for post-conviction relief. The District Court of Appeal of Florida, Second District, reversed the trial court's denial of Gill's motion on the issue of whether defense counsel had interfered with Gill's right to testify at trial, and the court remanded the case for an evidentiary hearing on that issue. William G. Dayton ("Dayton") was appointed to represent Gill at the evidentiary hearing. At the beginning of the evidentiary hearing, the trial court granted Gill's request to participate as co-counsel in that proceeding. Following the evidentiary hearing, the trial court issued its findings and an order granting Gill's motion for postconviction relief. Gill's conviction was vacated and set aside. The instant federal habeas corpus litigation, and Gill's claim that he was improperly denied his right to self representation, arise out of Gill's re-trial.

**B**

Dayton was appointed to represent Gill for the retrial. In a motion filed October 12, 1994, Gill requested permission to continue as co-counsel. Dayton consented to the co-counsel arrangement.

At the December 5, 1994 calendar call, the defense requested a continuance until March 13, 1995, and that request was granted. On January 30, 1995, Gill filed a motion for the appointment of substitute counsel. On February 15, 1995, Dayton moved to withdraw. Both motions were denied at a February 17, 1995 hearing and in written orders dated March 6, 1995. On March 3, 1995, Gill filed a "motion to dismiss appointed counsel and to allow the defendant to represent himself *pro se*." In that motion, Gill "reiterat[d] all the allegations made in his previously filed Motion to Appoint Substitute Counsel" and added that communication had broken down with Dayton. Mot. to Dismiss Appointed Counsel and Allow Def. to Represent Himself ("Mot. for Self-Rep.") at 1-2. Gill alleged in his March 3, 1995 motion that:

> Whereas, the choice in Mr. Gill's dilemma is to represent himself, rather than going to trial with incompetent and unp[re]pared Counsel. Therefore[,] he is requesting this Honorable Court to dismiss Mr. William G. Dayton, so that Mr. Gill can proceed with the necessary preparations needed to defend his case.

*Id.* at 2-3.

4

On March 6, 1995, one week before trial, the trial court heard argument on Gill's motion to appoint substitute counsel. The record of that proceeding reflects the following colloquy:

> [PROSECUTOR] VAN ALLEN: Mr. Gill has filed a *pro se* motion to allow – to ask the Court to allow him to represent himself. And my understanding is that there be additional counsel that are being sought to be retained. I don't know if that's the case or not.
>
> THE COURT: Do you want to deal with this?
>
> MR. DAYTON: Yes. As Mr. Van Allen has pointed out, Mr. Gill has filed a motion to be allowed to proceed *pro se*, representing himself —
>
> THE COURT: We've been through that, haven't we? That's nothing new.
>
> MR. DAYTON: No, Your Honor, although his former motion was to discharge me and to appoint different counsel. He's now asking to have me discharged and to let him represent himself. I would submit that this is further evidence of a complete breakdown in communication between Mr. Gill and myself, and I would renew my motion for leave to withdraw.
> As to the second matter Mr. Van Allen mentioned, I have spoken with a lawyer in Tampa, Mr. Dolan I believe his name is, who has spoken with friends and relatives of Mr. Gill about being retained. As of about 11:30 this morning I spoke with him, and no retainer had been received and no decision has been made by him and the lawyer whom he intended to associate as to whether or not they would in fact accept the case.
> They are seriously considering it and there are discussions ongoing with persons offering to put up money on behalf of Mr. Gill.
>
> THE COURT: Well, we're mixing issues. The motion to appoint in large part, if not exclusively, basically reiterates and

reincorporates all the previously filed motions to appoint substitute counsel. That was heard, that was denied. This kind of activity shows that the defendant himself really is not knowledgeable enough to proceed in these matters if he filed a duplicitous motion a couple of weeks after the other motion was disposed of.

Secondly, by the Court's observance of your conduct and handling of this case, even today I can see that you are competent and you are well kept abreast of this case. The fact that you may or may not be able to spend the time and communicate everything that you are doing to Mr. Gill is not enough to discharge an attorney who is obviously competent in performing the duties.

Now, if Mr. Gill chooses to replace you with some privately retained or funded counsel of his choice that's his prerogative. I certainly would not interfere with that, but it is set for trial the 13th [of March]. Whether that attorney can prepare for it in that time or not, I don't know. It hasn't happened, it's moot.

What's the State's response on these matters?

[PROSECUTOR] VAN ALLEN: Your Honor, you've covered basically what I was going to argue with the exception that Mr. Gill is, again in my estimation, attempting to build a record for himself. His argument basically is that since you're forcing me to go to trial with an incompetent or unprepared lawyer then I may as well go to trial on my own.

* * *

THE COURT: Well, it's old territory in essence.

* * *

THE DEFENDANT: Your Honor, I would like to bring to the Court's attention, this motion that I'm filing to represent myself is not a duplicate motion that I have filed before; this is a separate motion. I have filed a motion to dismiss counsel and to reappoint a new attorney. This motion is different in the fact that it addresses that I am going to —I would like to dismiss my — Mr. Dayton, my appointed attorney, and to represent myself. I have covered everything that I can

6

possibly think of in the motion to prove that Mr. Dayton has not prepared himself for this trial, and <u>I am certainly, definitely entitled to represent myself if I choose to do so. I believe that this is covered under the provisions of</u> *Faretta v. California* <u>and</u> *Gideon v. Wainwright* <u>and several more of the constitutional cases that will give me the right to represent myself</u>.

The point that I'd like to make out to prove my point that Mr. Dayton has not prepared this thing, I have ordered an index of the court's proceedings from the time that Mr. Dayton was appointed until the present time. I believe Mr. Dayton has filed three motions. He has not deposed any witnesses for the State or defense. He has not made any preparations other than what we are going through today to obtain any expert witnesses needed by the defense. He has not investigated any claims that I have made as far as the defense on the outside. And of course, it's quite obvious by the record that he has not filed any type of pretrial motions to preserve the record or preserve my appellate rights in this case.

<u>So it leaves me in a position to where I am forced to either be represented by Mr. Dayton which I know is not prepared or to represent myself at this time</u> and which I believe that I have a perfect right to do so. <u>In addition to that I am also asking for a continuance in the March 13th trial</u>. Both of these motions have been filed with the court. <u>Number one, so that I can make the necessary preparations</u> to prepare the case <u>if</u> I handle it. And, <u>number two, I am in the process of trying to retain private counsel</u> which is Mr. Gary Goldman from Tampa and his associate. We have approximately half the money raised; we're in the process of trying to raise the remainder in order to retain these attorneys. Therefore, this would be another reason that I'm asking for the continuance in order for them to prepare themselves to handle the case as soon as we can get the balance of the retainer to them.

Also, I'd like to bring to the Court's attention that I have filed a notice of appeal of a non-final appeal. I have and I am filing an emergency writ of certiorari to the District Court of Appeals in Lakeland because I believe that the court has abused its discretion in this case by not appointing substitute counsel where there was totally adequate means for doing so.

7

We see in several cases from the Second District to where – if there's a personal conflict between the accused and his appointed counsel and they do have a conflict that new counsel should be appointed. Also where the public defender asked to be withdrawn and where he indicates in his professional judgment that there's a conflict between he and his client that he also should be permitted to withdraw.

Based on these things <u>I am asking too for the Court to allow me to be my own attorney until such time as I can retain the necessary counsel from Tampa and also to continue the case so that we have the necessary time to prepare ourselves</u>.

\* \* \*

[PROSECUTOR] VAN ALLEN: Your Honor, again, as Mr. Gill points out the *Faretta* decision leaves Mr. Gill certain qualified rights to represent himself. One of the prerequisites of that is whether or not he could adequately defend himself. In light of the charges that are facing Mr. Gill, the fact that he has once previously been convicted on this evidence, and frankly in light of the comments to the Court today and in Mr. Gill's antics up until this point it should be clear that he is not capable of representing himself in a trial of this magnitude.

And <u>the fact that he's trying to hire counsel outside is further evidence of his desire not to represent himself</u>.

THE COURT: My previous comments before, the State's comments before and now, really are well taken. In *F[a]retta versus California*, 422 U.S. 806, 1995 S.Ct. 2525 (1975), the Supreme Court held that the Fifth Amendment of the United States Constitution allowed the defendant the right to represent himself, however, because there are traditional benefits associated with representation by counsel the accused must be made aware of the dangers and disadvantages or self-representation so that his waiver of counsel is knowing and intelligent.

<u>It is obvious that Mr. Gill's attempted waiver of counsel is not knowing and intelligent</u>. I cannot accept a waiver where it appears that the defendant is unable to make an intelligent and an understanding choice because of either his mental condition, age,

8

education, experience, and primarily the nature or complexity of the case or other factors which this record clearly demonstrates exists.
<u>This case is set for trial Monday. That's a major factor. There's no way Mr. Gill can be competent to represent himself under these circumstances</u>.
Anything further?

Tr. Mar. 6, 1995 Hrg. at 13-21 (emphases added).[1]

Following the March 6, 1995 hearing, the trial date was again continued. Trial was re-set for July 17, 1995. Three days before trial was set to begin, Steven Herman, filed a notice of appearance as retained counsel for Gill. The jury was selected on July 17, 1995. The next morning, Gill again expressed to the trial court his dissatisfaction with appointed counsel.[2]

---

[1] The record does not contain a separate written order denying Gill's March 3 motion to dismiss appointed counsel and allow the defendant to represent himself *pro se*.

[2] Gill maintains that the *Faretta* violation occurred at the March 6, 1995 hearing, rendering the discussion of his July 18, 1995 renewal of his motion to proceed *pro se* irrelevant. Gill Opening Br. at 11 n.4, 33 (citing *Orazio v. Dugger*, 876 F.2d 1508, 1512 (11th Cir. 1989), which provides that "[t]o avoid a waiver of a previously-invoked right to self-representation, a defendant is not required continually to renew a request once it is conclusively denied"); Gill Reply Br. at 6. The Court's discussion *infra* demonstrates that, taken alone, Gill's March 3, 1995 request was not sufficient to invoke his *Faretta* rights. The July 18, 1995 proceeding is included and considered here because of the renewed request. *See Edwards v. Arizona*, 451 U.S. 477, 482, 101 S.Ct. 1880, 1884 ("It is reasonably clear under our cases that waivers of counsel must not only be voluntary, but must also constitute a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which *depends in each case 'upon the particular facts and circumstances surrounding that case*, including the background, experience, and conduct of the accused.'") (emphasis added) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)).

THE COURT: . . . So do you have anything new that you want to discuss?

MR. DAYTON: Yes, Your Honor.

[PROSECUTOR] MENSH: Judge, I'm going to object to Mr. Gill – he's got a lawyer that the county's paying for. He's got a lawyer that his family's paying for. And for him to come in here now and start raising motions at 9:35 in the morning and argue his own case is an attempt to delay this trial, stall this trial, and turn it into a literal circus. I object to his participation other than to answer questions directed – asked by the Court or through his attorneys. [O]ne's been appointed, one's been retained to represent him.

[PROSECUTOR] VAN ALLEN: There's an additional ground here to the objection. There was a motion raised by Mr. Gill to be appointed co-counsel. That motion was denied by the court on the representation . . . by Mr. Dayton that he would consult with Mr. Gill and use Mr. Gill's input in making tactical decisions.

THE COURT: That's correct. That's old ground. However, I don't know what Mr. Gill is going to say.

[PROSECUTOR] VAN ALLEN: All right.

THE COURT: So until we, you know, give him an opportunity to say something, we can't make an intelligent decision.
What is it you want to say, sir?

THE DEFENDANT: Your Honor, I would like to request a renewal of my motion to dismiss my court appointed counsel, Mr. Dayton, on the grounds that . . . Mr. Dayton has not, and I repeat, has not prepared a defense that I have outlined for him and we have discussed for over a period of one and a half years.

THE COURT: Let me ask you a question. <u>Do you want to dismiss Mr. Dayton and continue the trial with Mr. Herman?</u>

10

THE DEFENDANT: <u>That would be what my expectations at this point would be.</u>

THE COURT: All right. Mr. Dayton, any objections to the motion?

MR. DAYTON: Your Honor, if Mr. Gill doesn't want me and the trial can go on, I will be happy to leave at any time.

THE COURT: All right. For purposes of understanding what you're saying, are you otherwise prepared, ready to proceed?

MR. DAYTON: Yes, Your Honor.

THE COURT: Mr. Herman, are you able to pick up the reins and proceed, and are you prepared to continue this trial today and finish it this week as anticipated and scheduled without Mr. Dayton's participation?

MR. HERMAN: Well, let me explain to the Court this. <u>I was retained last Tuesday to assist Mr. Gill</u>. It's always been clear between myself and my client that I was going to appear as co-counsel only. I could never take the lead in this case because I have not read the depositions. I've read only the trial transcript. I've never reviewed the court file in this case and, you know, <u>the purpose was for me to assist Mr. Dayton in the representation of Mr. Gill</u>.

THE COURT: So I understand your response to say, no, you cannot participate exclusively without Mr. Dayton's continuation?

MR. HERMAN: I could not act as lead counsel or primary counsel in this case. No, I could not.

THE COURT: It's my observation that Mr. Dayton is participating, effectively doing his job, doing the things that normally need to get done, and he has been doing that. Is there anything that you'd like to add, Mr. Herman, in that regard?

11

MR. HERMAN:  Well, the only thing that I can tell the Court is that I observed what appears to be an irreconcilable conflict between Mr. Dayton and Mr. Gill about how this case is going to be presented. Mr. Dayton has strong feelings about how the case should be presented and so does Mr. Gill.  And they appear not to be able to reach a compromise with respect to that.

THE COURT:  There are general strategy decisions that ordinally the attorney would make, as opposed to substantive matters that the defendant would have exclusive domain over, such as whether or not he wants to testify?

MR. HERMAN:  I would – in my opinion, it would be the former.

THE COURT:  All right.

MR. HERMAN:  But, you know, these are – what I would point out to the Court, that in my review of the proceedings that got us back to this trial, you're having the same sort of difficulties or problems between counsel and client as there were in the first case that were not reconciled and . . . to a great extent . . . brought this case back for a retrial.  And I see some very valid points in what Mr. Gill wants to do in this case.

THE COURT:  So it's a difference of opinion on strategic issues ordinarily decided by the attorney?

MR. HERMAN:  If you want to generalize.

\* \* \*

THE DEFENDANT:  Your Honor . . . this tactic that the State is alleging that I'm here to postpone and delay this trial is certainly not what I'm trying to do. I've been ready to go to trial since the first day that I was remanded back here from the state institution.  I've been working on this for five and a half years, and I know exactly

12

what needs to be done on this thing; not only by case law, but what witnesses.

Just let me give the Court an example of what has taken place. Mr. Dayton has not interviewed not one witness that appears on our witness list to be able to sit down and know what these witnesses are going to testify to if they should be called to trial. I have begged Mr. Dayton to renew the motion for experts that is desperately needed in this trial to form a proper defense. He ignores that. He has not done anything towards getting those except sit here and tell you that he needs an expert at our meeting 17 days ago, and provided no case law to you to even indicate that you had the authority to appoint expert witnesses.

THE COURT: Well. Before you get too far afield in depth, I think the question I asked you is what do you want to do. Do you want to proceed with Mr. Herman, because if that's what you want to do – is it your intent that you proceed without Mr. Dayton, or are you attempting to continue the case without Mr. Dayton and let Mr. Herman resume the reins? What is it that you want me to do for you at this point?

THE DEFENDANT: Judge, I'm trying to get a trial that I have a proper defense. It appears that Mr. Dayton does not want to present any defense.

* * *

THE COURT: I need to understand what it is you're – see, the thing is, when you avoid giving a direct answer, that reaffirms my prior observation that maybe there's some obstreperous behavior going on here, you're trying to get a delay or a continuance.

Okay. Let me ask the question again. Are you ready to proceed to trial today with you and Mr. Herman only without Mr. Dayton?

THE DEFENDANT: If Mr. Dayton plans on putting on no defense, yes, Your Honor. If he plans on putting on a defense, then he's welcome to stay aboard.

13

THE COURT:  Well . . . there's a confidence of communication between you and your attorney.  I can't predict –

THE DEFENDANT:  He informs me that he plans on putting on no defense.  That's what he informs me; so therefore, I cannot proceed with an attorney who is going to put no defense on.

THE COURT:  Well, you have Mr. Herman, of course.  You have another attorney.  You have access to another attorney.

THE DEFENDANT:  From my observation, there seems to be somewhat of a conflict between these two attorneys as to what needs to be done in the first place.   So, therefore, I'm put between a rock and a hard place on having to choose whether I should go to trial without having a defense or go to trial with a totally unprepared attorney who has made no attempt whatsoever to prepare himself for this trial.

THE COURT:  You know, you're in a situation where that may be a matter of opinion from your perspective.  I think Mr. Dayton does seem to be thoroughly familiar with your case.

THE DEFENDANT:  Yesterday's performance, sir, was a fiasco.

THE COURT:  This is not the time for a debate.

* * *

THE DEFENDANT:  <u>Your Honor, a solution to this problem may be that I request that I be appointed my own counsel and</u> –

[PROSECUTOR] VAN ALLEN:  Objection, Judge.  We've heard this motion.

THE COURT:  Let him finish so I understand where he's going.

14

THE DEFENDANT:  Let Mr. Dayton be known as a co-counsel and Mr. Herman will assist me in my attempts to be counsel.

THE COURT:  Okay.  I'm not sure I understood what you just said. . . .
You want me to appoint you another attorney?

THE DEFENDANT:  No, sir.  I am not asking for another attorney.

THE COURT:  What are you asking for?

THE DEFENDANT:  I'm asking for the Court to appoint me as my own counsel, self-representation.

THE COURT:  Okay. We've been that route before.

THE DEFENDANT:  I understand that.  I'm renewing my motion.

THE COURT:  And for the reasons I stated before, which I continue to believe are     accurate today, that wouldn't be appropriate.

THE DEFENDANT:  Those reasons are what, sir?

THE COURT:  I've already stated them.  We're wasting a lot of time rehashing things.

THE DEFENDANT:  I'm renewing my motion to be my own counsel, Mr. Dayton be co-counsel, Mr. Herman to assist me, is my motion to the Court.

THE COURT:  Does either lawyer for the defense have anything to add to this?

* * *

15

MR. HERMAN:  Well, Judge, it was my suggestion just a moment ago that he ask the Court to consider that. I think, you know, Mr. Gill is as knowledgeable about the law as any defendant I probably have ever had contact with over the years.  He's obviously prepared, spent more time on this case than any lawyer who's ever represented him, or probably sat on the other side of the table from him.  I guess if there's any defendant that might have a chance to represent himself, it would be Mr. Gill.

My thought was, rather than to have the jury question what happened to Mr. Dayton, and if you let Mr. Gill take the lead in this case and let him make the decisions about the presentation of the defense, Mr. Dayton can assist him in the areas in which Mr. Dayton is conversant and, you know, I will assist in general.

* * *

THE COURT:  Are you willing to place any restrictions on that, such as, someone else will cross-examine the victims?

THE DEFENDANT:  I have no objection to that, Your Honor.

THE COURT:  Who is going to cross-examine the victims?

MR. HERMAN:  It would be Mr. Dayton.

THE COURT:  All right. You have no objection to that?

THE DEFENDANT:  I have no objection to that.

[PROSECUTOR] MENSH:  I do, Judge.

THE COURT:  You want to be co-counsel for purposes of participating in the strategy decisions, is that correct?

THE DEFENDANT:  I'm not asking to be co-counsel.  I'm asking to be my own counsel.  As Mr. Dayton says, co-counsel.

16

THE COURT: You see, when you say things like that, it makes me understand that even though you may understand your particular case, you're not versed enough in procedural matters to understand how to effectively act as an attorney in the courtroom. And that's what you're asking me to allow you to do.

THE DEFENDANT: What we just discussed about cross-examining the witnesses, the reason I need Mr. Dayton as co-counsel, because it would be obvious to anyone that I could not ever effectively cross-examine the victims themselves. I realize that my own self. This is the reason that I need Mr. Dayton to do that for me, with the assistance of Mr. Herman.
The only thing that I'm asking for self-representation for is to be able to make the decisions in the strategy of my case, which I believe I know more about than anybody in this room.

* * *

THE COURT: I think they're referring to other matters, who to call as a defense, whether to call witnesses in defense. I think they have some differences beyond whether to testify or not.

MR. DAYTON: Without going into confident[ial] communications, Your Honor, that is the crux of the dispute.

THE COURT: All right. Let's do this. I'm inclined, if Mr. Gill is willing to, and wants to act as co-counsel for purposes of participating in strategy decisions only to give him standing as an attorney so that his decision will be given equal weight with his attorney's but not to participate in the cross-examining of witnesses or argument –

THE DEFENDANT: That's fine.

* * *

MR. HERMAN: I don't think this is a contrivance. I think this man truly believes that the defense needs to be put on in a certain

17

fashion and, you know, feels like his only change is trial to accomplish what he wants to do, which is, you know, to be found not guilty with respect to all four of these charges. And just, you know – this isn't a technical thing that he's coming up with. The man is fighting for what he believes is a fair trial.

I just wanted to say that.

THE COURT: All right. Mr. Dayton, do you have anything to add?

MR. DAYTON: Your Honor, basically, that is correct. There is a real sharp diversion opinion as to how we should proceed with the view towards an acquittal.

THE COURT: Okay. Let me ask you a question.

MR. DAYTON: Mr. Gill believes that my thoughts on that matter are totally wrong and incompetent.

THE COURT: All right. But those are dealing with the tactical or the strategic decisions, correct?

THE DEFENDANT: Yes.

THE COURT: Ordinarily it would be your domain to make. But if you have co-counsel for that decision, and he makes that decision, and he's also the client and you acquiesce to his decision, and you place these matters on the record as you go along, then you're not incompetent, are you? And maybe the co-counsel would be the one, if anyone, if it didn't work out, would be incompetent, and he would have no grounds to complain about that. Now, could you handle that situation?

MR. DAYTON: There may still be some problems with the view, with the difference of opinion as to whether or not the defense witnesses should be questioned extensively and coached before putting them on.

18

THE COURT:  You could put that on the record without the presence of the jury every step of the way so there is a record of what's going on, Mr. Gill making the final decision, no pros and cons, no possible penalties, knowing that he is not an attorney and he wants to proceed in that fashion.  And today he seems to be . . . coherent.  He's spoken to his private counsel.  Private counsel seems to be standing up for his belief in that Mr. Gill can handle that situation.  Can you handle that situation?

* * *

MR. DAYTON:  Yes, your Honor.

THE COURT:  Mr. Gill –

THE DEFENDANT:  <u>I'm willing to work with Mr. Dayton.  I have nothing against Mr. Dayton.  I'm just fighting for my life.</u>

THE COURT:  Well, I appreciate that, but, you know, I've got to look at the procedural safeguards, if enough procedural safeguards are instituted, and you are not in a situation where your own incompetency sells you down the river, then I don't want to do this trial again.  That's the whole object here.  All I want is to give you the same thing; that's a fair trial.  Win, lose or draw, it doesn't make any difference to me.  I've got to make sure procedurally that you are able to operate under those conditions.

You've got a private attorney, you've got a court appointed attorney.  You want to participate.  You're willing to take the stipulations that we just set forth, if the attorneys can handle that – I understand the State is objecting, but I don't think that would cause unnecessary delay with those stipulations.  The other way, I could see problems. And if you can do these things quickly, I'm not going to entertain a delay of this trial.

I'm willing to possibly give you a shot at that if it doesn't cause a delay.  If I find out that you being allowed to act as co-counsel is going to delay this trial, inordinate consultations, that you don't understand things and be bickering and arguing among your selves, we get in that situation, you're going to be back in as a defendant

19

only, not as a co-counsel. Because this trial's got to move along. There's no reason to delay this thing.

I've never had a trial get delayed like this one before, in the middle of difference procedures we have to take inordinate breaks to allow further consultation. That's – this is not a training ground to make you a competent lawyer. You know, this is not a training ground. I want you to understand that.

If you can take those stipulations that <u>you – are on there for strategy purposes only, not for actual participation as an attorney in the trial, but to be co-counsel, your own co-counsel, the strategy decision-making processes that an attorney would otherwise be</u>, if you can make those decisions, act in that capacity, limit it to that capacity, provided it doesn't create any delay or obstruction, that this case goes forward with, you know, reasonable diligent speed as ordinarily should occur in any case.

<u>That's acceptable to you, Mr. Gill</u>?

THE DEFENDANT: <u>Yes, sir</u>.

THE COURT: Mr. Dayton, that's acceptable?

MR. DAYTON: Sure.

THE COURT: Mr. Herman, that's acceptable?

MR. HERMAN: Let me make sure he understands something that might come up in that regard.

[PROSECUTOR] VAN ALLEN: Am I also to understand, Your Honor, that these tactical decisions in which Mr. Gill is playing a part, will become a matter of record, particularly in light of those areas where there is dissension as to what should be done?

THE COURT: Well, I think, from what we understood, Mr. Dayton is going to be placing these disagreements on the record as we go outside the presence of the jury.

\* \* \*

20

THE COURT:  <u>Mr. Gill, are you satisfied?</u>

THE DEFENDANT:  <u>Yes.</u>

THE COURT:  I understand the State's not happy about it, but we're going to protect this case the way we just discussed.
Yes, sir.  Let's work.

THE DEFENDANT:  Mr. Dayton has now renewed the motions for our experts.  I don't know whether you gave an opinion on that.

THE COURT:  Yeah, he's renewed it. The original rulings, if you were listening, are applicable.  I'm not receding, especially in the middle of trial.

THE DEFENDANT:  Would you care to see the case law on that, sir?

THE COURT:  No.  You know, here's the problem.  Remember what I just told you? You can't act as an attorney beyond the strategy. You were willing to take that stipulation. If you're not willing to take that stipulation, tell me now.
All right.  Let's proceed in the courtroom.

July 18, 1995 Trial Tr. at 171-93 (emphases added).  Trial proceeded, with Dayton and Herman participating in the examination of witnesses and arguments to the court.  Gill regularly conferred with Dayton and Herman during trial, and the attorneys conveyed to the trial court Gill's concerns about the handling of the case. At one point the court allowed Gill to present his specific objections to Dayton's failure to cross-examine witnesses adequately.

21

The jury found Gill both guilty of a capital sexual battery and a lewd and lascivious act count against each of the two girls. The jury acquitted Gill of attempted sexual battery. The trial court sentenced Gill to life with a minimum twenty-five years for the capital sexual battery and two consecutive fifteen-year sentences for each lewd and lascivious act conviction. The Florida District Court of Appeal, Second District summarily affirmed the judgment of conviction and the trial court's sentencing decision in a per curiam decision without a written opinion.[3]

On December 29, 1998, Gill filed a *pro se* motion for post-conviction relief with the trial court. In an August 25, 2000 order, the trial court summarily denied all but two of the sixteen grounds raised in Gill's motion and ordered the State to show cause that Gill was not entitled to an evidentiary hearing regarding his conviction on the lewd and lascivious act counts. After an evidentiary hearing in January 2002, the trial court vacated the two convictions for a lewd and lascivious act in the presence of a child. Gill appealed the denial of the remaining claim. On October 22, 2003, the District Court of Appeal of Florida, Second District,

_____

[3]The State maintains, and Gill does not dispute, that "[o]n direct appeal, the State did not rely on the trial court's pretrial finding [that] [Gill] attempted to waive his right to counsel but such was not knowing and voluntary. Instead, the State maintained Gill had not made an unequivocal request to represent himself." Respt. Answer Br. at 39.

22

affirmed the denial of Gill's motion for post-conviction relief without written opinion. *Gill v. State*, 864 So. 2d 410 (Fla. 2d DCA 2003) [table].

**C**

On January 27, 2004, Gill filed the present federal habeas petition in the United States District Court for the Middle District of Florida. Gill asserted sixteen grounds for relief. In a March 31, 2008 Order, the district court denied Gill's petition with prejudice. Regarding Gill's claim that the state courts violated his constitutional right to represent himself pursuant to *Faretta*, the district court explained:

> Grounds Two and Three are related. Gill alleges in Ground Two that he was forced to trial with an attorney with whom he had a severe conflict of interest. In Ground Three Gill alleges that the trial court erred by denying his right to represent himself. The respondent argues that no actual conflict existed and Gill never unequivocally asserted his right to self-representation. The record supports the respondent's position but also shows Gill's dissatisfaction with counsel's representation.

Mar. 31, 2008 Order at 10-11 (footnote omitted). After recounting the history of Dayton's representation of Gill, the district court quoted extensively from the hearing transcripts excerpted above and noted that, at the conclusion of the exchange on the morning of July 18, 1995, "[t]he trial judge resolved the dilemma to the mutual satisfaction of Gill and his counsel." *Id.* at 16.

23

Summarizing the merit's of Gill's arguments regarding his right to self representation, the district court explained:

> . . . The trial court recognized that Gill's right to self-representation is controlled by *Faretta v. California*, 422 U.S. 806 (1975). Consequently, the state court's decision is not contrary to a controlling Supreme Court decision. The question becomes whether the trial court unreasonably applied *Faretta* or unreasonably determined the facts. The answer to both is "No."

*Id.* at 27. The district court reasoned as follows:

> . . . Placed in proper perspective, each time Gill invoked his right to self-representation he was seeking to obtain either new counsel or a continuance, or to control trial strategy. *See, e.g.,* Respondent's Exhibit 1 Vol. XV at 2978 ("Based on these things I am asking too for the Court to allow me to be my own attorney until such time as I can retain the necessary counsel from Tampa and also to continue the case so that we have the necessary time to prepare ourselves.") and Vol. XVII at 3247 ("The only thing that I'm asking for self-representation for is to be able to make the decisions in the strategy of my case, which I believe I know more about than anybody in this room."). Gill's primary complaint about Dayton was whether to present a defense, and if Dayton agreed to present a defense, Gill was satisfied with proceeding to trial with Dayton as counsel. *See, e.g.,* Respondent's Exhibit 1 Vol. XVII at 3252 ("I'm willing to work with Mr. Dayton. I have nothing against Mr. Dayton.") and Vol. XVII at 3256 ("If he plans on putting on a defense, then he's welcome to stay aboard."). Consequently, Gill never clearly and unequivocally waived his desire for counsel.

> Gill never showed that Dayton had a conflict of interest. Instead, the conflict was purely a difference of opinion on strategy; Gill and Dayton disagreed on which trial strategy presented the best chance for a favorable verdict. *See, e.g.,* Respondent's Exhibit 1 Vol. XVII at 3238 ("MR. HERMAN: Mr. Dayton has strong feelings about how the case should be presented and so does Mr. Gill.") and Vol.

24

XVIII at 3493 ("MR. DAYTON: The way this whole thing has developed has simply made it impossible to conduct the case in anything vaguely resembling what I perceive it should be conducted to protect Mr. Gill's interest."). The trial court patiently listened to the reported problems and fashioned a compromise that satisfied both Gill and his attorneys. "COURT: Mr. Gill, are you satisfied? THE DEFENDANT: Yes." (Respondent's Exhibit 1 Vol. XVII at 3256). Consequently, Gill was neither forced to trial with an attorney who had a conflict of interest (Ground Two) nor denied his right to self-representation (Ground Three). Instead, Gill received the benefit of both self-representation (the trial court authorized Gill to decide which defense witnesses to present and allow Gill to present argument to the court outside the presence of the jury) and counsel (Dayton and Herman conducted opening and closing statements and the examination of witnesses). In essence, the compromise the trial court fashioned afforded Gill more rights than he was entitled to receive. *See McKaskle v. Wiggins*, 465 U.S. 168, 183 (1984) (Faretta does not require a trial judge to permit "hybrid" representation . . . .). The state court's rejection of these claims was neither an unreasonable application of *Faretta* nor an unreasonable determination of the facts.

*Id.* at 27-29.

Gill timely appealed. This Court has jurisdiction to review the final order of the district court. 28 U.S.C. § 2253(a). On December 9, 2008, this Court granted a limited Certificate of Appealability. The parties submitted extensive briefing, and the matter was heard at oral argument on December 15, 2010. The only issue before this Court is that framed in the Certificate of Appealability.

## II

This Court reviews a district court's order denying habeas relief *de novo*. *Smith v. Sec'y, Dep't of Corrs.*, 572 F.3d 1327, 1332 (11th Cir.2009) ("We review

25

*de novo* the district court's decision about whether the state court acted contrary to clearly established federal law, unreasonably applied federal law, or made an unreasonable determination of fact."). The district court's factual findings are reviewed for clear error, while mixed questions of law and fact are reviewed *de novo*. *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005).

Because Gill's claim was filed subsequent to the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), our review of underlying state court decisions is limited by the terms of 28 U.S.C. § 2254, as amended by AEDPA. *Williams v. Taylor*, 529 U.S. 362, 402-03, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).

Within the framework of AEDPA, a federal court may only grant habeas relief from the judgment of a state court where the state court's adjudication of the habeas claim, "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2); *Berghuis v. Thompkins*, ___ U.S. ___, 130 S.Ct. 2250, 2258, 176 L.Ed.2d 1098 (2010); *Johnson v. Upton*, 615 F.3d 1318, 1329-30 (11th Cir. 2010). In *Williams v. Taylor*, the Supreme Court

26

interpreted the deferential standard embodied in the "contrary to" or "unreasonable application" prong of AEDPA analysis as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. at 412-413, 120 S.Ct. 1495, 1522, 146 L.Ed.2d 389 (2000). The Court also explained that, in determining whether a state court's decision represents an unreasonable application of clearly established federal law, a federal court conducting habeas review "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *accord Harrington v. Richter*, ___ U.S. ___, 131 S.Ct. 770, 786-87 (Jan. 19, 2011) ("As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."). Regarding the "unreasonable determination" prong, this Court has explained that "[u]nder AEDPA, we accord a

27

presumption of correctness to a state court's factual findings." *Mason*, 605 F.3d at 1118-19. Additionally, the Supreme Court has explained the treatment of state court fact finding as follows:

> Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding, § 2254(d)(2); *see also Williams [ v. Taylor,*] 529 U.S. [362,] 399, 120 S.Ct. 1495, 146 L.Ed.2d 389 [(2000)] (opinion of O'CONNOR, J.).
>
> . . . [This] deference does not[, however,] imply abandonment or abdication of judicial review. Deference does not by definition preclude relief. A federal court can disagree with a state court[ ] . . . and, when guided by AEDPA, conclude the decision was unreasonable ... [because] the factual premise was incorrect by clear and convincing evidence.

*Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003).

### III

Gill contends that the district court erred in two ways. First, Gill argues that the district court erred by relying on a finding that the state court did not make. Namely, Gill argues that, because the state trial court denied Gill's motion to represent himself on the ground that his waiver was not knowing and intelligent and that he was not competent to represent himself, the district court erred in denying habeas relief on different ground: that Gill never clearly and

28

unequivocally waived his Sixth Amendment right to counsel. Second, Gill

maintains that the district court erred by failing to review on the merits the "legally

and factually unsupported rationale" articulated by the state trial court. Addt'l

Reply Br. at 1. Gill asks this Court to vacate the district court's order and remand

with instructions to consider whether the state court's finding that Gill's waiver

was not knowing and intelligent was contrary to or an unreasonable application of

clearly established federal law or was based on an unreasonable determination of

the facts.

**A**

Gill's arguments on appeal proceed from the premise that the state trial

court's statements about Gill's competence to represent himself and about whether

his waiver was knowing and intelligent are dispositive. We disagree. The state

trial court's comments at the March 6, 1995 and July 18, 1995 hearings are not the

object of our inquiry. Because the plain language of AEDPA requires federal

courts to examine the relevant state court "decision,"[4] our inquiry must consider

---

[4]AEDPA states:

(d) An application for a writ of habeas corpus on behalf of a person in custody
pursuant to the judgment of a State court shall not be granted with respect to any
claim that was adjudicated on the merits in State court proceedings unless the
adjudication of the claim–

      (1) *resulted in a decision* that was contrary to, or involved an
      unreasonable application of, clearly established Federal law, as

whether the outcome of the state court proceedings permits a grant of habeas relief in this case.

Here, the Florida District Court of Appeal, Second District summarily affirmed Gill's conviction and sentence on direct appeal, and it likewise summarily affirmed the denial of post-conviction relief. The state appellate court's affirmances warrant deference under AEDPA because "the summary nature of a state court's decision does not lessen the deference that it is due." *Wright v. Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002); *see also Harrington v. Richter*, 131 S.Ct. at 784-85 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."). Accordingly, we must determine whether the district court erred in concluding that the Florida District Court of Appeal, Second District's affirmance of the trial court's decision to deny Gill's motion to dismiss appointed counsel and allow the defendant to represent himself *pro se* was contrary to, or involved an unreasonable application of, clearly established federal law or

---

determined by the Supreme Court of the United States; or

(2) *resulted in a decision* that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (emphasis added).

30

was based on an unreasonable determination of the facts. *Id.* at 786 ("Under §

2254(d), a habeas court must determine what arguments or theories supported or . .

. could have supported, the state court's decision; and then it must ask whether it is

possible fairminded jurists could disagree that those arguments or theories are

inconsistent with the holding in a prior decision of this Court.").

As an initial matter, we point out that the "contrary to" prong of the AEDPA

standard is not implicated here. A state court decision is "contrary to . . . clearly

established Federal law, as determined by the Supreme Court of the United States"

where the state court (1) "arrives at a conclusion opposite to that reached by [the

Supreme Court] on a question of law" or (2) "confronts facts that are materially

indistinguishable from a relevant Supreme Court precedent and arrives at a result

opposite to [the Supreme Court]." *Williams*, 529 U.S. at 405-06. The Supreme

Court has not addressed a claim precisely like Gill's, nor has it ruled on a

"materially indistinguishable" set of facts. Accordingly, we proceed to consider

Gill's claim under AEDPA's "unreasonable application" standard.

This Court has not previously been called upon to address the precise issue

presented here: summary affirmance by a state appellate court of a trial court's

decision based on potentially flawed reasoning. *But cf. Smith v. Sec'y, Dept. of

Corrs.*, 572 F.3d 1327, 1333 (11th Cir. 2009) ("In order to merit AEDPA

31

deference the state court need not expressly identify the relevant Supreme Court precedent, nor make a perfect statement of the applicable rule of law, nor provide a detailed opinion covering each aspect of the petitioner's argument.")  However, we find the Fifth Circuit's reasoning on the issue persuasive, and this Court's precedent supports a literal reading of the plain language of AEDPA under these circumstances.  Additionally, the United States Supreme Court's recent ruling in *Harrington v. Richter* confirms that such a plain reading of the statutory language is required.  *Harrington v. Richter*, 131 S.Ct. at 786 (explaining that Section 2254(d), as amended by AEDPA, "preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's *decision* conflicts with this Court's precedents.  It goes no farther." (emphasis added)).

Reviewing the correctness of a state supreme court's prejudice determination in state habeas proceedings, the Fifth Circuit explained that

> even after *Williams [v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 1512, 146 L.Ed.2d 389 (2000)][,] it is not immediately clear to us whether a federal habeas court looks exclusively to the objective reasonableness of the state court's ultimate conclusion or must also consider the method by which the state court arrives at its conclusion.  This question takes on some significance in a case such as [this], where the state court's holding (that Neal suffered no prejudice under *Strickland*) may be objectively reasonable, but in reaching that holding, the court did not adequately evaluate and weigh the substantial evidence – the implicit suggestion being that the state court

32

may have reached a different, but still "reasonable," conclusion if a more thorough method of reasoning had been applied.

*Neal v. Puckett*, 286 F.3d 230, 244-45 (5th Cir. 2002) (footnote omitted). The

Fifth Circuit went on to review the circuit split that appeared to be emerging on the

issue, explaining:

> The Seventh Circuit, sitting en banc, appears to have concluded that federal courts must scrutinize a state court's method of reasoning. "By posing the question whether the state court's treatment was 'unreasonable,' § 2254(d)(1) requires federal courts to take into account the care with which the state court considered the subject." *Lindh v. Murphy*, 96 F.3d 856, 871 (7th Cir.1996) (en banc), *rev'd on other grounds*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). The reasonableness of a court's application of federal law must be measured, at least in part, by determining whether a state court provided "a responsible, thoughtful answer reached after a full opportunity to litigate." *Id.*[5]
>
> Certain passages in the *Williams* decision could be read to support this view. Writing for the Court, Justice Stevens explained that the Virginia Supreme Court's "prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding-in reweighing it against the

[5]In a footnote to this discussion of the Seventh Circuit's opinion in *Lindh*, the Fifth Circuit observed:

> In spite of the straightforward language of *Lindh*, a Seventh Circuit panel rejected the argument that the "unreasonable application" test requires a federal habeas court to consider the state court's process of reasoning. *See Hennon v. Cooper*, 109 F.3d 330 (7th Cir.1997). Chief Judge Posner contended that *Lindh* stands only for the proposition that "the better the job the state court does in explaining the grounds for its rulings, the more likely those rulings are to withstand further judicial review." *Id.* at 335, 117 S.Ct. 2059.

*Neal*, 286 F.3d 230, 245 n.11.

evidence in aggravation." *Williams*, 120 S.Ct. at 1515. There is, therefore, at least some basis for the view that Section 2254(d)'s "unreasonable application" standard refers to the quality of the state court's analysis.

On the other hand, this process-oriented view has been rejected by other circuits and challenged by Chief Judge Posner of the Seventh Circuit. In his view, scrutinizing state courts' methods of reasoning "would place the federal court in just the kind of tutelary relation to the state courts that the [AEDPA was] designed to end." *Hennon [v. Cooper]*, 109 F.3d [330][,] 334-35 [(7th Cir. 1997)]. Similarly, we do not interpret AEDPA in such a way that would require a federal habeas court to order a new sentencing hearing solely because it finds the state court's written opinion unsatisfactory. It seems clear to us that a federal habeas court is authorized by Section 2254(d) to review only a state court's "decision," and not the written opinion explaining that decision.

In the absence of clear guidance from the Supreme Court, we conclude that our focus on the "unreasonable application" test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence. The latter approach appears unduly formalistic considering that the federal habeas court has the full record before it and is competent to determine whether *Strickland* has been unreasonably applied to the case before it. Even though a thorough and well-reasoned state court opinion may be more likely to be correct and to withstand judicial review, it simply does not follow that "the criterion of a reasonable determination is whether it is well reasoned." *Id.* at 334-35. Instead, the only question for a federal habeas court is whether the state court's determination is objectively unreasonable.

Thus, in making our unreasonable application determination, we look only to the substance of the Mississippi Supreme Court's decision. The state court concluded that presentation of the additional mitigating evidence would probably not have changed the outcome of the case. The precise question, then, is whether the court's ultimate

conclusion – that there was no prejudice and, consequently, no ineffective assistance of counsel under the *Strickland* test – is objectively unreasonable.

*Neal*, 286 F.3d at 245-46 (footnotes omitted).

We agree, and the United States Supreme Court had confirmed in *Harrington v. Richter*, that the "precise question" that must be answered under the AEDPA standard must focus on state court's ultimate conclusion. This Court took the same approach in the context of reviewing a district court's denial of a habeas petitioner's mental competency claim that the state court had summarily rejected:

> . . . [T]he question here is whether the state court's summary, which is to say unexplicated, rejection of the federal constitutional issue qualifies as an adjudication under § 2254(d) so that it is entitled to deference. Six circuits have squarely addressed that question, all of them concluding that the summary nature of a state court's decision does not lessen the deference that it is due. *See Sellan v. Kuhlman*, 261 F.3d 303, 310-12 (2d Cir.2001); *Bell v. Jarvis*, 236 F.3d 149, 158-62 (4th Cir.2000) (en banc), *cert. denied*, 534 U.S. 830, 122 S.Ct. 74, 151 L.Ed.2d 39 (2001); *Harris v. Stovall*, 212 F.3d 940, 943 n. 1 (6th Cir.2000); *Aycox v. Lytle*, 196 F.3d 1174, 1177-78 (10th Cir.1999); *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir.1999), *cert. denied*, 528 U.S. 1143, 120 S.Ct. 994, 145 L.Ed.2d 942 (2000); *Delgado v. Lewis*, 181 F.3d 1087, 1091 n. 3 (9th Cir.1999), *cert. granted and judgment vacated on other grounds*, 528 U.S. 1133, 120 S.Ct. 1002, 145 L.Ed.2d 926 (2000). We agree with those circuits.

> We begin with the plain language of the statute itself. [citations] The plain language of § 2254(d)(1) requires only that the federal claim have been "adjudicated on the merits in State court proceedings" and have "resulted in a decision" that is neither contrary to nor involves an unreasonable application of Supreme Court precedent. That is all the text of the provision requires.

35

A judicial decision and a judicial opinion are not the same thing.  The chief responsibility of judges is to decide the case before them.  They may, or may not, attempt to explain the decision in an opinion.  The text of § 2254(d)(1) accepts this orthodox view. [citations]  The statutory language focuses on the result, not on the reasoning that led to the result, and nothing in that language requires the state court adjudication that has resulted in a decision to be accompanied by an opinion that explains the state court's rationale. *See Sellan*, 261 F.3d at 311 ("Nowhere does the statute make reference to the state court's process of reasoning."); *Aycox*, 196 F.3d at 1177 ("The focus is on the state court's *decision* or *resolution* of the case." (emphasis in original)).  Accordingly, all that is required is a rejection of the claim on the merits, not an explanation.

To conclude otherwise on this issue would be writing into § 2254(d)(1) an additional requirement that Congress did not put there – a requirement that the state courts explain the rationale of their decisions. . . .  Our function is to apply statutes, to carry out the expression of the legislative will that is embodied in them, not to "improve" statutes by altering them.  [citation].

*Wright v. Sec'y for Dept. of Corrs.*, 278 F.3d 1245, 1254-55 (11th Cir. 2002).

We apply the same reasoning to the facts presented in this case:  the statutory language focuses on the result, not on the reasoning that led to the result.  Although the district court relied on grounds other than those articulated by the trial court at the March 6, 1995 and July 18, 1995 hearings in determining that habeas relief is not warranted here, the district court did not err in concluding that "[t]he state court's rejection of these claims was neither an unreasonable application of *Faretta* nor an unreasonable determination of the facts."  Mar. 31,

36

2008 Order at 29. Nothing in the language of AEDPA required the district court to evaluate or rely upon the correctness the state court's process of reasoning. Although the trial court stated from the bench that Gill's waiver of counsel was "not knowing and intelligent" and that there was "no way Mr. Gill [could] be competent to represent himself" in light of the fact that trial was set to begin in one week, Tr. Mar. 6, 1995 Hrg. at 21, these statements did not constitute the trial court's ruling; nor is there any indication that it was the basis for the Florida District Court of Appeal, Second District's summary affirmance. *Cf. Harrington v. Richter*, 131 S.Ct. at 785 (rejecting Richter's argument that the state high court's summary affirmance was not due AEDPA deference because there existed a "theoretical possibility" that the members of that court may not have agreed on the reasons for denying his petition). The question before the district court was, and before this Court is, whether the state court's judicial decision, rejecting Gill's *Faretta* claim, involved an unreasonable application of clearly established federal law.

It follows that AEDPA's "unreasonable determination of the facts" standard is only implicated here to the extent that the validity of state court's ultimate conclusion, the denial of Gill's request to proceed *pro se*, rests on fact finding related to the trial court's statements about whether Gill was competent to

represent himself or that his waiver of counsel was knowing and intelligent. *See Williams*, 529 U.S. at 399 (explaining that federal court may disagree with a state court decision "and, when guided by AEDPA, conclude the decision was unreasonable . . . [because] the factual premise was incorrect by clear and convincing evidence"). As the following discussion explains, the Court finds that the validity of the state court decision here is not premised on the trial court's unreasonable fact finding. Gill has not demonstrated by clear and convincing evidence that the record reflects an insufficient factual basis for affirming the state court's decision that the denial of Gill's motion did not violate his federal constitutional rights under the Sixth Amendment. To the contrary, the record reflects that the district court was correct in concluding that "each time Gill invoked his right to self-representation[,] he was seeking to obtain either new counsel or a continuance, or to control trial strategy" and "[c]onsequently, Gill never clearly and unequivocally waived his desire for counsel." Mar. 31, 2008 Order at 27-28.

**B**

We turn now to the merits of Gill's claim that the trial court's denial of his request to proceed *pro se* is a judicial decision that involves "an unreasonable application of . . . clearly established Federal law, as determined by the Supreme

Court of the United States." 28 U.S.C. § 2254(d)(1). The seminal Supreme Court decision on the issue of the right to self representation is *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), in which Faretta, a criminal defendant, "clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel." *Id.* at 835. Whether Faretta's invocation of his right to counsel was "clear and unequivocal" was not a disputed issue in the case. Rather, the Court's analysis focused on whether Faretta's relinquishment of "the many traditional benefits associated with the right to counsel" was knowing and intelligent. The Court explained:

> . . . Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.

> Here, weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed free will. The trial judge had warned Faretta that he thought it was a mistake not to accept the assistance of counsel, and that Faretta would be required to follow all the "ground rules" of trial procedure. We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on voir dire. For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.

39

In forcing Faretta, under these circumstances, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense. Accordingly, the judgment before us is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*Id.* at 835-36 (internal quotations, citations, and footnotes omitted). In *Faretta*, the Supreme Court also clarified that the right to self representation does not include a right "to abuse the dignity of the courtroom[,]" to avoid compliance with the "relevant rules of procedural and substantive law[,]" or to engage in "serious and obstructionist misconduct[.]" *Id.* at 834-35, n.46.

Although *Faretta* was not primarily concerned with clarity and equivocation in making a request to proceed *pro se*, it is clear from the Court's decision that a trial court's obligation to conduct a "*Faretta* hearing," at which a defendant is "made aware of the dangers and disadvantages of self-representation[,]" is triggered by the defendant's "clear and unequivocal assertion of a desire to represent himself." *See, e.g., Raulerson v. Wainwright*, 469 U.S. 966, 969-70, 105 S.Ct. 366, 369, 83 L.Ed.2d 302 (1984) (Marshall, J. dissenting from denial of certiorari) ("Accordingly, in *Faretta* we indicated that a defendant's clear and unequivocal assertion of a desire to represent himself must be followed by a hearing, in which he is 'made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing

and his choice is made with eyes open.'" (quoting *Faretta*, 422 U.S. at 835) (footnote omitted)); *Stano v. Dugger*, 921 F.2d 1125, 1144 (11th Cir. 1991) ("Once the right of self-representation has been asserted clearly and unequivocally, understandable to the trial court by the reasonable person standard, then and only then is that court, under Supreme Court and Eleventh Circuit case law, required to conduct the requisite inquiry to determine whether the criminal defendant's decision to represent himself is knowing, intelligent and voluntary."); *Cross v. United States*, 893 F.2d 1287, 1290 (11th Cir. 1990) ("In recognition of the thin line that a district court must traverse in evaluating demands to proceed pro se, and the knowledge that shrewd litigants can exploit this difficult constitutional area by making ambiguous self-representation claims to inject error into the record, this Court has required an individual to clearly and unequivocally assert the desire to represent himself."); *Dorman v. Wainwright*, 798 F.2d 1358, 1366 (11th Cir. 1986) ("Insofar as the desire to proceed pro se is concerned, petitioner must do no more than *state his request*, either orally or in writing, *unambiguously* to the court *so that no reasonable person can say that the request [to proceed pro se] was not made*." (emphasis added)).

The former Fifth Circuit articulated the *Faretta* standard as follows:

> While the right to counsel is in force until waived, the right of self-representation does not attach until asserted. In order for a

41

defendant to represent himself, he must "knowingly and intelligently" forego counsel, and the request must be "clear and unequivocal."

*Brown v. Wainwright*, 665 F.2d 607, 610 (Former 5th Cir. 1982) (quoting *Faretta*, 422 U.S. at 835).

Beyond setting out the standard for the invocation of the right to self representation and waiver of the right to counsel, the Supreme Court has explained that "[a] defendant can waive his *Faretta* rights." *McKaskle v. Wiggins*, 465 U.S. 168, 182, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984). In *Wiggins*, the Court considered whether a *pro se* defendant's right to self representation was violated by the unsolicited participation of standby counsel. The Court was concerned with whether "excessive involvement by counsel w[ould] destroy the appearance that the defendant is acting *pro se*." *Id.* at 181. On the facts before it in *Wiggins*, the Court explained:

> . . . Participation by counsel with a *pro se* defendant's express approval is, of course, constitutionally unobjectionable. <u>A defendant's invitation to counsel to participate in the trial obliterates any claim that the participation in question deprived the defendant of control over his own defense.</u> Such participation also diminishes any general claim that counsel unreasonably interfered with the defendant's right to appear in the status of one defending himself.
>
> Although this is self eviden[t], it is also easily overlooked. <u>A defendant like Wiggins, who vehemently objects at the beginning of trial to standby counsel's very presence in the courtroom, may express quite different views as the trial progresses</u>. Even when he insists that he is not waiving his *Faretta* rights, a *pro se* defendant's solicitation

42

of or acquiescence in certain types of participation by counsel substantially undermines later protestations that counsel interfered unacceptably.

The record in this case reveals that Wiggins' *pro se* efforts were undermined primarily by his own, frequent changes of mind regarding counsel's role. Early in the trial Wiggins insisted he wished to proceed entirely without assistance, but shortly thereafter he expressly agreed that counsel should question a witness on voir dire. Wiggins objected vehemently to some of counsel's motions, but warmly embraced others. Initially Wiggins objected to standby counsel's presence; later he refused to allow the trial to proceed in their absence; in the end he agreed that counsel would make a closing statement for the defense. The only two long appearances by counsel at Wiggins' trial, one before the jury and one outside its presence, were both initiated with Wiggins' express approval. [citation to record] In these circumstances it is very difficult to determine how much of counsel's participation was in fact contrary to Wiggins' desires of the moment.

*Id.* at 182-83 (emphases added); *see also Brown*, 665 F.2d at 611 ("Even if defendant requests to represent himself, . . . the right may be waived through defendant's subsequent conduct indicating he is vacillating on the issue or has abandoned his request altogether."); *id.* ("A finding of waiver is also supported by counsel's statement to the court that he and defendant had worked out their differences.").

Here, the trial court identified *Faretta* as controlling Supreme Court precedent and accurately characterized the protections outlined in *Faretta*. The Florida District Court of Appeal, Second District summarily affirmed the trial

43

court's decision. The record demonstrates that Gill's invocation of his right to self-representation was equivocal.

Gill's written March 3, 1995 motion to substitute himself in as counsel closely followed the trial court's denial of his motion to remove Dayton and substitute in other counsel. With the March 3, 1995 motion, captioned as a motion "to dismiss appointed counsel and allow the defendant to represent himself pro *se*," Gill indicated a breakdown in communications with Dayton and requested that the trial court dismiss Dayton "so that Mr. Gill can proceed with the necessary preparations needed to defend his case." Mot. for Self-Rep. at 3. Even standing alone, and certainly read in the context of related proceedings,[6] Gill's written request to "proceed with the necessary preparations" is far from a clear statement of Gill's desire or intent to proceed without counsel. Additionally, the record supports the district court's conclusion that Gill's statements at the subsequent hearings regarding the motion were qualified and conditioned in such a way as to

---

[6]Gill argues that this Court's decision in *Orazio v. Dugger*, 876 F.2d 1508 (11th Cir. 1989), dictates a determination that he did not waive his right to self representation. In *Orazio*, this Court considered a *Faretta* claim that originated when appointed counsel filed a motion to withdraw. At the hearing on that motion, Orazo stated, "Yes, I did want to represent myself on two of the matters that I'm facing right now which is the extortion and the extradition to New York and the contraband charge, so three of them altogether." *Id.* at 1509 (internal quotation marks omitted). Although Gill's written March 3, 1995 motion included a request to proceed *pro se*, read in light of the trial Court's March 17, 1995 denial of his motion to appoint substitute counsel and his statements at the March 6, 1995 hearing, it does not support the conclusion that the trial court erred in not treating it as a clear and unequivocal assertion of Gill's desire to proceed *pro se*.

44

render his request equivocal. *See, e.g., U.S. v. Mendez-Sanchez*, 563 F.3d 935, 939 (9th Cir. 2009) (holding that "while a defendant may invoke his or her self-representation rights after a denial of a motion to substitute counsel, the invocation must be unequivocal[;] [a] request to represent oneself made while at the same time stating a preference for representation by a different lawyer and rearguing the change of counsel motion is insufficient to invoke *Faretta*."); *see also Brown*, 665 F.2d at 611 (explaining that right to of self-representation may be waived through "conduct indicating [defendant] is vacillating on the issue or has abandoned his request altogether").

Additionally, the record reflects that Gill vacillated between self-representation and being represented by counsel. Specifically, Gill made clear to the trial court that he did not wish to proceed without counsel; rather, he wished to proceed with retained counsel, but he needed time to accumulate the funds necessary to secure the counsel of his choice. *See, e.g.,* Tr. Mar. 6, 1995 Hr'g at 17-18 (coupling his request to proceed *pro se* with a request for a continuance of the March 13 trial date); *id.* at 18 ("Based on these things[,] I am asking too for the Court to allow me to be my own attorney until such time as I can retain the necessary counsel from Tampa and also to continue the case so that we have the necessary time to prepare ourselves."); *see also* July 18, 1995 Trial Tr. at 174

45

(retained counsel, Herman, stating that he was retained to assist Gill and that "[i]t's always been clear between myself and my client that I was going to appear as co-counsel only. . . . [T]he purpose was for me to assist Mr. Dayton in the representation of Mr. Gill); *id.* at 180 (Gill stating, "I'm renewing my motion to be my own counsel, Mr. Dayton to be co-counsel, Mr. Herman to assist me, is my motion to the Court."), *id.* at 182-83 ("[T]he reason I need Mr. Dayton as co-counsel, because it would be obvious to anyone that I could not ever effectively cross-examine the victims themselves. I realize that my own self. This is the reason that I need Mr. Dayton to do that for me, with the assistance of Mr. Herman.").

Finally, Gill's argument that his right to self representation was violated when then state trial court forced him to accept "hybrid" counsel fails for want of factual and legal support. The hybrid arrangement crafted by the trial court was initially proposed by Gill and his retained counsel. The arrangement to which Gill agreed assured him the opportunity to participate in strategy decisions, provided him with the appointed counsel he indicated was essential to effective cross-examination of witnesses, and permitted the assistance of private counsel that was knowledgeable and respectful of his choices regarding trial strategy.[7]

_____

[7]The Supreme Court addressed a similar "hybrid" arrangement in Wiggins, explaining:

Accordingly, neither the trial court judge's rejection of Gill's request to proceed *pro se*, nor the Florida District Court of Appeal, Second District's summary affirmance thereof, was objectively unreasonable. The record demonstrates that Gill's request was equivocal and was not sufficient to invoke *Faretta*. He consistently coupled his request to represent himself with an expression of his preference for representation by a different lawyer; and his request for, and acceptance of, assistance from both appointed and retained counsel constituted a waiver of his *Faretta* rights. Because the state court's decision was not objectively unreasonable, the district court did not err in denying habeas relief in this case.

## Conclusion

The district court's denial of habeas relief is **AFFIRMED**.

---

> *Faretta* does not require a trial judge to permit "hybrid" representation of the type Wiggins was actually allowed. But if a defendant is given the opportunity and elects to have counsel appear before the court or jury, his complaints concerning counsel's subsequent unsolicited participation lose much of their force. A defendant does not have a constitutional right to choreograph special appearances by counsel. Once a *pro se* defendant invites or agrees to any substantial participation by counsel, subsequent appearances by counsel must be presumed to be with the defendant's acquiescence, at least until the defendant expressly and unambiguously renews his request that standby counsel be silenced.

*Wiggins*, 465 U.S. at 183.

47